UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MALIBU MEDIA, LLC,                        )
                                          )
                        Plaintiff,        )
                                          )
            vs.                           )          No. 1:13-cv-00205-WTL-MJD
                                          )
KELLEY  TASHIRO,                          )
N. CHARLES TASHIRO,                       )
                                          )
                        Defendants.       )

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SANCTIONS**

This matter comes before the Court on Plaintiff's "Motion for Sanctions Against

Defendants for Spoliation of Evidence and Perjury," [Dkt. 130], and Plaintiff's "Supplement to

Its Motion for Sanctions Against Defendants for Spoliation of Evidence and Perjury." [Dkt. 159.]

For the reasons set forth below, the Magistrate Judge recommends that the Court **GRANT**

Plaintiff's motion for sanctions. [Dkts. 130 & 159.]

## I.        Background

In 2013, Malibu Media, LLC ("Plaintiff") retained a German company—IPP Limited—to

investigate whether certain internet users were infringing Plaintiff's copyrights by uploading

and/or downloading its copyrighted adult movies via a BitTorrent client. [*See* Dkt. 1.] IPP

monitored the BitTorrent file distribution network[1] and identified certain IP addresses[2] that were

being used to distribute Plaintiff's copyrighted movies. [Dkt. 5-1 ¶¶ 5-7 (Decl. of Tobias Fieser,

---

[1] The monitoring relevant to this case occurred between January 14, 2012 and January 16, 2013. [Hr'g Tr. 12:8-12.] Plaintiff's counsel referred to this time as the "period of recorded infringement," and the Court will adopt this terminology as necessary.
[2] An IP address is a number that an Internet Service Provider ("ISP") assigns to one of its subscribers. [Dkt. 5-1 ¶ 7.] The IP address is unique to the subscriber, and the ISP retains records of which subscriber is assigned a given IP address at particular times. [*Id.* ¶¶ 8-9.]

February 4, 2013).] On February 5, 2013, Plaintiff filed suit against an unidentified defendant, alleging that the defendant had used a BitTorrent client to infringe the adult movies on Plaintiff's X-Art website. [*See* Dkt. 1.] The individual was initially known only by her IP address—98.222.184.69—but Plaintiff subpoenaed the alleged infringer's ISP—Comcast—to determine that the infringing activity occurred at the address of Kelley Tashiro ("Defendant Kelley"). [*See* Dkt. 14.] Plaintiff accordingly filed an amended complaint against Defendant Kelley on April 8, 2013. [Dkt. 13.] Attorney Jonathan Phillips ("Phillips") entered an appearance on Defendant Kelley's behalf. [Dkt. 19.]

Plaintiff further amended its complaint on May 15, 2014. [Dkt. 124.] This amendment added Defendant Kelley's husband, N. Charles Tashiro, ("Defendant Charles"), as the second named defendant in the case. [*See id.*] Attorney Phillips thereafter began representing both Defendant Kelley and Defendant Charles. [*See, e.g.*, Dkt. 134.]

Plaintiff's current motion alleges two types of misconduct: 1) spoliation of evidence based on Defendants' alleged deletion of computer files; and 2) perjury in the form of misrepresentations by Defendants at their depositions and in their responses to various discovery requests.

## A. Deletion of Files

During discovery, Defendant Kelley agreed to provide the computer hard drives from her household to Quantum Discovery for forensic imaging. [*See* Dkt. 130 at 3.] She did so on December 23, 2013, and Quantum Discovery created images of the hard drives on the same day. [*See* Dkt 76-1 ¶ 17 (Decl. of Patrick Paige, February 10, 2014).] Quantum Discovery then sent the images of the hard drives to Plaintiff's expert witness, Patrick Paige. [*Id.*] Mr. Paige received a forensic image of a Western Digital hard drive with serial number WXHZ08077637; a forensic

image of a hard drive labelled "int HDD inside usb encl."; and a forensic image of an iPad hard drive. [*Id.* ¶¶ 18-19.] He also reported that Quantum Discovery had received a fourth hard drive from Defendants' household, but that the fourth hard drive could not be imaged. [*Id.* ¶ 20.]

Mr. Paige examined each of the images of the hard drives for evidence of BitTorrent use. [*Id.* ¶ 21.] On the "int HDD inside usb encl." hard drive, Mr. Paige found evidence that the "hard drive was repeatedly used to download BitTorrent files and also had BitTorrent software installed on the hard drive." [*Id.* ¶ 23.] He also determined that "numerous files and folders associated with BitTorrent use were *deleted* from the hard drive on December 22, 2013 at approximately 10:00 pm—the night before the hard drive was turned over to Quantum Discovery for imaging." [*Id.* ¶ 25 (emphasis original).] Mr. Paige recovered some of the deleted files and determined that "many of these BitTorrent files [were] associated with adult movies" and that others were "BitTorrent clients, that enable the BitTorrent protocol to work." [*Id.* ¶ 26.] He also concluded that "Malibu Media, LLC's copyrighted content could have been deleted from the drive." [*Id.* ¶ 28.][3]

Defendants' expert, Delvan Neville, also examined Defendants' hard drives. [*See* Dkt 101-1 (Decl. of Delvan Neville).] He agreed "with Mr. Paige's finding that there were many files and folders deleted on 22 December 2013," but "dissent[ed] from Mr. Paige's finding as to whether any of the deleted files could be Malibu Media, LLC's copyrighted content." [*Id.* ¶¶ 5-6.] He stated that he recovered all of the deleted files, searched them, and found no evidence that they contained Plaintiff's copyrighted content. [*Id.* ¶¶ 14-24.] Despite Neville's purported

---

[3] At the hearing, the parties agreed to call the drive from which the files had been deleted the "Stover" drive, [*see* Hr'g Tr. 17:8], in reference to a non-party—Ed Stover—who had previously owned the drive. The Magistrate Judge will use this terminology throughout the remainder of this report.

recovery, Plaintiff contends that the above-described deletion constitutes spoliation of evidence, and Plaintiff asks the Court to enter default judgment against Defendants. [*See* Dkt. 130.]

### B.  Defendants' Alleged Misrepresentations

Plaintiff deposed Defendant Kelley in February 2014. [Dkt. 107-1 (Kelley Tashiro Dep., February 25, 2014).] She testified that she had visited adult websites, but she denied searching for Plaintiff's X-Art website. [Kelley Tashiro Dep. 52:12-53:23.] In her answers to Plaintiff's Interrogatories, Defendant Kelley also denied any knowledge of BitTorrent other than that gained through this lawsuit. [Dkt. 76-2 ¶ 13.]

Plaintiff also deposed Defendant Kelley's husband, Defendant Charles. [Dkt 107-2 (Charles Tashiro Dep., February 25, 2014).] He testified that he had used BitTorrent, [Charles Dep. 26:3-27:13], and that he had visited Plaintiff's X-Art website. [Charles Dep. 52:23-53:7.] Thereafter, Plaintiff amended its complaint to add a claim of copyright infringement against Defendant Charles. [*See* Dkt. 124.] Plaintiff filed the amended complaint on May 15, 2014. [*Id.*]

During discovery, Plaintiff also served interrogatories and requests for production on Defendant Kelley. [*See* Dkt. 130 at 5.] Plaintiff's Interrogatory No. 4 asked Defendant Kelley to identify "each of the Computer Devices used in [her] home during the preceding two years" and to state "who has been authorized to use the Computer Device, the times during which each such person was authorized to use the Computer Device, and [the identity of] the person who primarily uses the Computer Device." [Dkt. 76-2 ¶ 4.] Defendant Kelley answered the interrogatories on October 17, 2013 and supplemented her responses on December 31, 2013, January 16, 2014, and January 19, 2014. [*Id.* at 10.] Her responses identified four hard drives: a Dell Inspiron laptop hard drive; an iPad hard drive; a Sony Vaio desktop hard drive; and the Stover drive. [*Id.* ¶ 4]

4

This proved to be an incomplete list of the computer drives in Defendants' home: On April 8, 2014, Plaintiff's counsel wrote to attorney Phillips and stated that "it has been brought to my attention that there are several hard drives/external devices that the defendant failed to disclose in discovery responses." [Dkt. 130-3 at 3.] Plaintiff's counsel specifically identified a WD 5000AAV External 1.65 hard drive; a WD My Passport 070A 1032 hard drive; and a WDC WD40 hard drive. [*Id.*] Plaintiff's counsel based these identifications on Mr. Paige's examination of the image of Defendant Kelley's laptop. Paige determined that the three drives "were connected to Kelley Tashiro's laptop computer" but had not been disclosed to Quantum Discovery for imaging. [*See* Dkt. 109-2.] Plaintiff's counsel also noted that the drives had been connected in the early morning hours of December 23, 2013—the day the drives were to be turned over to Quantum Discovery—and stated that these drives should have been disclosed in response to Plaintiff's requests for production. [Dkt. 130-3 at 3.]

Attorney Phillips responded to Plaintiff's letter on the same day. He wrote that Defendant Kelley "is unaware of these drives," such that there was "no 'failure to disclose'" in Defendant Kelley's discovery responses. [*Id.* at 5.] Phillips also stated that his client "connected nothing" to her computer on the night of December 22, and he suggested the connections were done by Quantum Discovery. [*Id.* at 7.] In another email the next day, Phillips maintained that the drives "were not provided, because they do not exist, or at least to not [sic] known to exist by Kelley Tashiro." [*Id.* at 10.]

The parties later determined that two of the hard drives identified by Plaintiff's counsel actually had been produced and had been included in the four hard drives originally provided to Quantum Discovery. [*See* Dkt. 137 at 14.] The last of the hard drives, however, had not been produced, and on May 31, 2014, Defendant submitted a fourth supplement to her response to

5

Plaintiff's interrogatories. [Dkt 130-2 at 11.] She stated that she "only recently became aware of an additional external harddrive contained within the [Tashiro] household," and she said she was "unaware of the drive's existence previously." [*Id.* at 4.] The additional drive was a "Western Digital External HD" with serial number WCASUZ940825. [*Id.* at 4.] Defendant Kelley stated that her husband was the primary user of the device. [*Id.*]

Based on the above events, Plaintiff contends that Defendants and their counsel intentionally misrepresented the number of hard drives in their household in their discovery responses and in their communications with Plaintiff's counsel. [Dkt. 130 at 5.] Plaintiff argues that this constitutes perjury and that default is the only appropriate sanction for the alleged misconduct. [*Id.* at 16.]

### C.  Supplement to Motion for Sanctions

On October 1, 2014, Plaintiff filed its "Supplement to its Motion for Sanctions Against Defendants for Spoliation of Evidence and Perjury," [Dkt. 159], and asserted that since the time of the filing of its original motion, "additional evidence of perjury [had] come to light." [*Id.* at 1.] Plaintiff claimed that additional evidence showed that both Defendant Kelley and Defendant Charles had committed perjury, and that both Defendants had intentionally withheld evidence.

#### 1.  Defendant Kelley

Plaintiff's Interrogatory No. 11 asked Defendant Kelley to "[i]dentify any communication you have received from your ISP in the last two years including any changes regarding the terms of your contract or agreement, and any notices that you have received, including but not limited to notices of copyright infringement." [Dkt. 130-2 ¶ 11.] Defendant Kelly answered: "Yearly updates from Comcast. No other communications other than billings." [*Id.*]

Plaintiff's Request for Production No. 7 similarly asked Defendant Kelley to produce all documents "referring, relating to, or comprising written communications between you and your ISP, including all  . . . Digital Millennium Copyright Act notices." [Dkt. 159 at 2.][4] Defendant Kelley answered: "Tashiro has no such documents other than those of Response 3-38, 235-286. In particular, no Digital Millenium [sic] Copyright Act Notices have ever existed." [*Id.*]

On August 22, 2014, however, Plaintiff deposed the Tashiros' Internet Service Provider—Comcast. [*Id.*; *see also* Pl.'s Ex. 50 (Dep. of Colin Padgett, August 22, 2014).] Prior to the deposition, Comcast produced to Plaintiff seven Digital Millennium Copyright Act notices that were sent to Defendants. [Dkt. 159 at 2-3.] Plaintiff thus concludes that Defendant Kelley "provid[ed] knowingly false answers" to Plaintiff's interrogatories and requests for production, and thereby committed perjury by failing to disclose the notices of copyright infringement that she had in fact received. [*Id.* at 3.]

### 2. Defendant Charles

Plaintiff deposed Defendant Charles on February 25, 2014. [*Id.* at 3.][5] Charles testified that he used BitTorrent "just for music," [Charles Dep. 27:12-13], and he specifically denied using BitTorrent to download other types of media, such as movies. [Charles Dep. 27:6-11.] On June 18, 2014, however, Plaintiff served Requests for Admission on Defendant Charles, and Defendant Charles subsequently admitted that he "used BitTorrent to download adult films" from several different websites. [Dkt. 159 at 3-4.] Plaintiff thus contends that Defendant Charles'

---

[4] Digital Millennium Copyright Act ("DMCA") notices are communications provided by an ISP to its customer notifying the customer that the ISP has received a complaint that the customer is engaged in activity that infringes another person's copyrights. [*See* Pl.'s Ex. 50 at 27:22-28:4 (Dep. of Colin Padgett).]
[5] Charles was not a Defendant at this time, as it was not until May 15, 2014 that Plaintiff filed the amended complaint naming Charles as a defendant. [*See* Dkt. 124.]

deposition testimony was "an intentional lie" because his own admissions prove he used BitTorrent "for more than just music." [*Id.*]

### 3.   Withholding Evidence

Plaintiff's supplement accuses Defendants Charles and Kelley of withholding relevant evidence. As noted above, Plaintiff's expert stated that three drives had been connected to Kelley Tashiro's computer on the night of December 22, 2013 or in the early morning of December 23, 2013, but that the drives were not disclosed to Plaintiff or provided to Quantum Discovery for forensic imaging. Plaintiff's counsel then wrote to Defendants' counsel on April 8, 2014 to inquire about these drives, which included the Western Digital hard drive described above. As noted previously, Defendant's counsel responded that Defendant Kelley was "unaware of these drives," and that there was "no 'failure to disclose'" in Defendant Kelley's discovery responses. [Dkt. 130-3 at 5.]

Plaintiff, however, also served requests for admission on Charles Tashiro, in which Charles admitted that he "used the Western Digital hard drive . . . on December 22, 2013." [Dkt. 159 at 5.] Plaintiff thus asserts that Charles "used the Western Digital hard drive" on December 22, but then made the "affirmative choice to exclude it and keep it from Plaintiff" by not providing the hard drive to Quantum Discovery the next day. [Dkt. 159 at 5.] Plaintiff contends that this constitutes "bad faith," sanctionable conduct even if Charles himself was not a named defendant in December of 2013. [Dkt. 161 at 3.]

Plaintiff also adds that it served Requests for Admission on Defendant Kelley. [Dkt. 161 at 2-3.] In her responses, Kelley admitted that—*before* the Western Digital hard drive was disclosed to Plaintiff in Defendants' May 31, 2014 fourth supplement to their responses to Plaintiff's interrogatories—Kelley "knew [her] husband owned the Western Digital external hard

8

drive" and had "seen the above hard drive in [her] home." [Dkt. 161-2 ¶¶ 1-2.] Plaintiff thus

contends that Kelley had no basis for claiming that she was previously unaware of the hard drive

when she responded to Plaintiff's discovery requests. [*See* Dkt. 161 at 3.] Plaintiff notes that it is

especially difficult to reconcile Defendant Kelley's May 31, 2014 Supplement to her response to

Plaintiff's interrogatories with Defendant Kelley's later response to Plaintiff's request for

admissions. In the former, Kelley stated that she "was unaware of the drive's existence

previously," [Dkt. 130-2 ¶ 4], but in the latter, she admitted that, "prior to May 31, 2014, [she]

knew that [her] husband owned the Western Digital external hard drive[.]" [Dkt. 161 at 2-3.]

Plaintiff thus asserts that Defendant Kelley perjured herself by falsely responding to Plaintiff's

interrogatories. [Dkt. 161 at 2.]

### D. Hearing and New Counsel

The Court referred Plaintiff's motion for sanctions to the undersigned Magistrate Judge

for proposed findings and recommendations, [Dkt. 16], and the Magistrate Judge set the matter

for an evidentiary hearing on January 29, 2015. [Dkt. 167.] On the morning of the hearing,

however, attorney Phillips advised the Court that Defendant Charles planned to invoke his Fifth

Amendment rights to avoid testifying. [Dkt. 206.] Phillips concluded that this created a conflict

of interest between Defendants Charles and Kelley, and Phillips committed to withdrawing as

counsel for Charles. [*Id.*] The Court continued the hearing to allow Defendant Charles to retain

new counsel, which he did on March 2, 2015. [Dkt. 216 (Mot. for Erin Kathryn Russell to

Appear Pro Hac Vice).] With Defendants Charles and Kelley represented by separate counsel,

the Court conducted the evidentiary hearing on April 30, 2015. [Dkt. 239.] The Court then

conducted a supplemental hearing to allow for additional argument by counsel on May 8, 2015.

[Dkt. 241.]

### E.  Motions in Limine and Objections

Prior to the April 30 hearing, Defendants filed seven motions in limine in an attempt to preclude several of Plaintiff's proposed witnesses from testifying. [*See* Dkts. 170, 172, 173, 175, 176, 177 & 179.] The Court denied the motions on the grounds that the hearing would involve no jury, such that preemptively excluding the proposed testimony was unnecessary. [Dkt. 227 (citing *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *Barna v. United States*, 183 F.R.D. 235, 239 (N.D. Ill. 1998)).] The Court's order, however, acknowledged that Defendants would be permitted to challenge Plaintiff's witnesses through specific objections at the time of their proposed testimony.

At the hearing, Defendants objected to testimony offered by Michael Patzer. [*See* Hr'g Tr. 197:15-21, Apr. 30, 2015.] The Court took the objection under advisement and allowed Patzer to testify. [Hr'g Tr. 200:9-10.] Defendants also objected to Plaintiff's questioning of Defendant Kelley. [Hr'g Tr. 24-26.] They asserted that certain questions infringed on the marital communications privilege as asserted by Defendant Charles. [Hr'g Tr. 24:16-18.] The Court overruled that objection at the time of the hearing, and the Court now addresses both objections below.

### A.  Objection to Patzer's Testimony[6]

Michael Patzer is an independent contractor who "designed, implemented, monitor[s] and maintain[s] the data collection system" that IPP uses to identify the IP addresses of potential copyright infringers. [Dkt. 73-13 ¶¶ 3-4 (Decl. of Michael Patzer, February 5, 2014).] As

---

[6] The Court addresses Defendants' objections primarily because the parties devoted considerable time to Patzer's testimony both at the hearing and in briefing Defendants' motion in limine. Patzer's testimony is also relevant in assessing Defendants' motive for concealing evidence. *See infra* part II.A.2.a. Ultimately, however, the Court finds that the wealth of other evidence establishing Defendants' misconduct is sufficient to support an entry of sanctions, regardless of Patzer's testimony.

explained in their motion in limine, Defendants asserted that Patzer would testify as an expert, but that Plaintiff had violated Fed. R. Civ. P. 26(a)(2) by not properly disclosing his identity or proposed testimony. [Dkt. 171 at 1.]

Rule 26(a)(2) requires the disclosure of the identity of expert witnesses, *see* Fed. R. Civ. P. 26(a)(2)(A), as well as certain information associated with such testimony. *See* Fed R. Civ. P. 26(a)(2)(B)-(C). Expert witnesses are those who present evidence founded on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). Lay witnesses, in contrast, present evidence consisting of opinions or inferences "rationally based on the perception of the witness." Fed. R. Evid. 701(a).

The Seventh Circuit has addressed the distinction between lay and expert testimony in the context of police investigations. *See, e.g.*, *United States v. Rollins*, 544 F.3d 820, 832-33 (7th Cir. 2008); *United States v. Oriedo,* 498 F.3d 593, 603 (7th Cir.2007). When an officer's testimony is **not** "limited to what he observed in [a given] search or to other facts derived exclusively from [the] particular investigation" at issue, and instead involves the officer bringing his "wealth of experience . . . to bear on those observations," the testimony is expert testimony. *Oriedo*, 498 F.3d at 603. In contrast, when testimony involves only an officer's "own personal observations and perceptions derived from [the] particular case" at hand, the testimony is lay testimony. *Rollins*, 544 F.3d at 823. Courts have applied a similar distinction in civil cases. *See, e.g.*, *WNS Holdings, LLC v. United Parcel Serv., Inc.*, No. 08-CV-275-BBC, 2009 WL 2136961, at *3 (W.D. Wis. July 14, 2009), *aff'd*, 368 F. App'x 144 (Fed. Cir. 2010) (finding that testimony arising "solely from [witness's] personal, first-hand sensory observations" was lay testimony).

In this case, Mr. Patzer first answered foundational questions about the nature of IPP's business and the duties of someone in his occupation. [Hr'g Tr. 196:10-197:12; 200:21-201:14.]

He thus noted that IPP's[7] primary business is tracking online copyright infringement so that records of such activities can be given to copyright owners interested in enforcing their rights. [*See, e.g.*, Hr'g Tr. 201:11-14.] He also stated that he was personally involved in maintaining the hardware and software that IPP uses to accomplish this task. [Hr'g Tr. 197:1-12.]

Next, Mr. Patzer indicated that IPP maintained the relevant records in the ordinary course of business, and he answered additional questions designed to show that the records met the requirements for admission under Federal Rule of Evidence 803(6). [*See, e.g.*, Hr'g Tr. 201:19-21.] He then stated that IPP had in its possession records indicating that someone with IP address 98.222.184.69[8] had used a BitTorrent protocol to upload or download pieces of Plaintiff's copyrighted movies. [*See, e.g.*, Hr'g Tr. 202:2-3 ("Yes, yes. The IP address is in our records referring to Malibu Media content, movies.").] Finally, he described that he had sent those records to Plaintiff's expert, Patrick Paige, for later analysis.[9] [Hr'g Tr. 203:12-19.]

Based on the foregoing, Mr. Patzer limited his testimony to his "own personal observations and perceptions." *Rollins*, 544 F.3d at 823. He described only his relationship to IPP; the nature of his business; and the sorts of records he had obtained while working in that business. He thus did not have to bring his "wealth of experience . . . to bear" on facts or events outside of his personal observations, *Oriedo*, 498 F.3d at 603, such that he was not testifying as an expert.

---

[7] At times, Patzer referred to "Excipio" rather than "IPP," but Plaintiff explained that Excipio is a German company that licenses its systems and servers for use by IPP. [Dkt. 198 at 3.]

[8] This IP address corresponds to the IP address identified in Plaintiff's original complaint, [Dkt. 1-1 at 1], which Comcast later confirmed was the Tashiros' IP address. [Pl.'s Ex. 50 at 13:17-14:4 (Dep. of Colin Padgett).]

[9] Defendants later challenged the chain of custody of the records, [*see, e.g.*, Hr'g Tr. 219:18-19], but this challenge affects the weight of Patzer's testimony, rather than the expert or lay nature of the testimony. *Cf. United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008) (challenge to chain of custody affects weight—not admissibility—of evidence).

Further, the fact that Patzer discussed matters that happened to involve technical issues does not transform his testimony into expert testimony. *See, e.g.*, *United States v. Tomkins*, No. 07 CR 227, 2012 WL 1357701, at \*11 (N.D. Ill. Apr. 19, 2012) (citing *Bank of China v. NBM LLC*, 359 F.3d 171, 181 (2d Cir.2004)) ("The fact that [the witness] has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions . . . . Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his position in the business.")). Patzer in this case may have had specialized knowledge about the process by which Defendant Kelley's IP address was identified, but he gained that knowledge through the investigation that gave rise to this case, and he conducted that investigation "not because of experience, training or specialized knowledge within the realm of an expert, but because of . . . his position in the business" of IPP. *Bank of China*, 359 F.3d at 181. His testimony therefore was not expert testimony, and Fed. R. Civ. P. 26(a)(2) accordingly imposed no obligation on Plaintiff to produce expert reports for Patzer.

Next, even if Patzer *was* an expert for whom Plaintiff should have provided expert reports, the Court would not exclude his testimony. Rule 37 provides that a failure to disclose information under Rule 26(a) prohibits use of a witness "to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). The district court has broad discretion in deciding whether an error is harmless or justified, but should consider factors such as "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3)

the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). As described below, these factors indicate that any failure to disclose Patzer was harmless, such that his testimony should not be excluded.

First, Plaintiff disclosed to Defendants in February 2014 the substance of Patzer's expected testimony. [*See* Dkt. 73 at 5-8.[10]] This gave Defendants over a year before the April 2015 hearing to consider Patzer's testimony and to depose Patzer if Defendants so desired. The Court thus finds that the testimony of Patzer presented little risk of surprise to Defendants and that Defendants had the opportunity to cure any concerns they may have had about the witness's testimony. Additionally, the Court sees little risk of prejudice to Defendants' interests: Defendants themselves assert that Patzer's testimony is "irrelevant" to the spoliation and perjury issues that formed the focus of the hearing, [Dkt. 171 at 4], and although the Court does not agree with this assessment,[11] it nonetheless rings hollow for Defendants to simultaneously argue both that the testimony was irrelevant and that the testimony would "greatly" damage their interests. [*See id.* at 3.] Finally, the Court finds no "bad faith or willfulness" involved in any lack of disclosure: As noted above, Plaintiff previously informed Defendant of the substance of Patzer's testimony, and Plaintiff also included Mr. Patzer on its list of proposed witnesses for the hearing. [Dkt. 169 at 2.] This, in turn, precludes a finding that Plaintiff had some sort of "bad faith" plan to ambush Defendants. *See, e.g.*, *Sadowski v. Bombardier Ltd.*, 539 F.2d 615, 620 (7th Cir. 1976) (finding no "knowing concealment" when "witnesses were listed in the pretrial

---

[10] Docket No. 73 is Plaintiff's response to Defendants' previously resolved motion to compel. Among other information on Mr. Patzer, the response contains a section specifically devoted to Patzer's testimony. [Dkt. 73 at 7.]
[11] Patzer's testimony about infringement associated with Defendant Kelley's IP address helps establish that copyright infringement did in fact occur. As more fully explained below, this sheds light on whether Defendants had a motive to destroy or conceal evidence, which in turn is relevant to whether their conduct was done in "bad faith," as necessary for an imposition of spoliation sanctions.

report"). The factors described in *David*, 324 F.3d at 857, thus support a finding that any lack of disclosure was harmless, such that the Court need not exclude the testimony of Plaintiff's witness. Defendants' objection to Mr. Patzer's testimony is accordingly **OVERRULED**, and the Court will consider Mr. Patzer's testimony as necessary in evaluating Plaintiff's motion for sanctions.

### B.  Marital Communications Privilege

Defendant Charles objected that certain questions posed to Defendant Kelley implicated the martial communications privilege. [Hr'g Tr. 24:16-18.] This privilege applies in both civil and criminal proceedings. *See Stanfield v. Dart*, No. 10 C 06569, 2011 WL 5301784, at *1 (N.D. Ill. Nov. 3, 2011). It belongs to both spouses and thus may be asserted by either spouse. *United States v. Brock*, 724 F.3d 817, 820. As a result, one spouse may preclude the other from testifying on matters within the scope of the marital communications privilege, even if that other spouse wishes to testify about those matters. *See id.* Defendant Charles was thus entitled to raise the martial communications privilege in an attempt to prevent Defendant Kelley from testifying.

The privilege, however, has limits. First, it "applies only to communications made in confidence between the spouses during a valid marriage. Acts observed by the spouse are not protected by the communications privilege." *United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992); *see also Brock*, 742 F.3d at 820 ("The marital communications privilege applies even after the marriage has dissolved, but the protected subject matter includes only what one spouse communicates to the other, not what one spouse learns about the other in other ways, such as by observing the other's actions."). Second, an exception to the marital communications privilege exists in cases in which the spouses are joint participants in an alleged crime. *United States v. Darif*, 446 F.3d 701, 706 (7th Cir. 2006) (citations and internal quotations omitted) ("The marital

communications privilege places a limitation on truthful disclosure. However, we have recognized an exception to the privilege when spouses are joint participants in the underlying offense. We do not value criminal collusion between spouses, so any confidential statements concerning a joint criminal enterprise are not protected by the privilege.").

The exception for joint misconduct is relevant to Defendant Charles' assertion of the privilege in this case. Although Defendants in this case have not been charged with a crime, Defendants **have** been accused of jointly participating in discovery misconduct. [*See, e.g.*, Dkts. 130 & 159; *see also* Hr'g Tr. 19:2-3 ("[T]he evidence will show that they colluded and they were in cahoots together in suppressing this evidence.").] Just as the courts "do not value criminal collusion between spouses," *Darif*, 446 F.3d at706, the courts do not value collusion between spouses to frustrate the discovery process. Such collusion would merely impair this Court's important truth-seeking function, and the Court accordingly concludes that the rationale for the joint criminal conduct exception applies to the Tashiros' alleged misconduct in this case. As such, they should not be allowed to preclude inquiry into their misconduct through reliance on the marital communications privilege.

This expansion of the joint crime exception is also consistent with the treatment of other privileges. In the context of the attorney-client privilege, for instance, courts have "demonstrate[d] a judicial willingness to expand the exception" to tortious conduct and discovery violations. *In re Heraeus Kulzer GmbH*, No. 3:09-CV-530 RM, 2012 WL 1493883, at *2 (N.D. Ind. Apr. 26, 2012) (citations omitted); *see also, e.g.*, *1100 W., LLC v. Red Spot Paint & Varnish Co.*, No. 1:05-CV-1670-LJM-JMS, 2009 WL 232060, at *4 (S.D. Ind. Jan. 30, 2009) (applying crime-fraud exception where evidence showed "that [defendant] purposefully concealed relevant documents during discovery"); *Nobelpharma Ab v. Implant Innovations, Inc.*,

16

930 F. Supp. 1241, 1260 (N.D. Ill. 1996), *aff'd*, 141 F.3d 1059 (Fed. Cir. 1998) (emphasis added) ("The crime-fraud exception to the attorney-client privilege applies when a person consults an attorney to further a continuing or future crime, fraud or **other misconduct**."). These cases are consistent with the general proposition that evidentiary privileges are "in derogation of the search for the truth," and thus must be "construed narrowly." *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (discussing attorney-client privilege); *see also United States v. Nixon*, 418 U.S. 683, 710 (1974) "[Privileges] are not lightly created nor expansively construed, for they are in derogation of the search for truth.").

Here, the same considerations are relevant. Although the existence of the marital communications privilege demonstrates the importance of protecting the marital relationship, that importance has limits: just as courts have narrowly construed the attorney client privilege and have expansively construed the crime-fraud exception to that privilege, the Court in this case narrowly construes the marital communications privilege and expansively construes the joint-crime exception to that privilege. Hence, even if Defendants do not face criminal charges, their joint participation in the alleged misconduct in this case is sufficient to find that they cannot rely on the marital communications privilege. Just as it did at the hearing, then, the Court **OVERRULES** Defendants' objection to Plaintiff's questioning of Defendant Kelley. The Court will accordingly consider Kelley's testimony as necessary in evaluating Plaintiff's motion for sanctions.

## II.      Discussion

The Magistrate Judge first addresses Plaintiff's allegations of spoliation of evidence and then addresses Plaintiff's allegations of perjury.

17

## A.  Spoliation of Evidence

Plaintiff first seeks imposition of sanctions for spoliation of evidence resulting from Defendants' deletion of files on December 22, 2013. [Dkt. 130 at 1-3.] A court may impose such sanctions under Fed. R. Civ. P. 37 or under its own inherent power. *See, e.g.*, *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005), *aff'd*, 200 F. App'x 592 (7th Cir. 2006). Rule 37 applies when a party violates a court order, *id.*, but Plaintiff in this case has not identified any court order that Defendants have allegedly violated, nor does Plaintiff cite Rule 37 in its motion for sanctions or its supplement. [*See* Dkts. 130 & 159.] The Magistrate Judge thus concludes that Plaintiff asks the Court to exercise its inherent powers to sanction Defendant.

Assessing whether spoliation occurred requires a two-part inquiry. First, the Seventh Circuit has noted that "courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *see also Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 429 (7th Cir. 2010) (observing that plaintiff "fail[ed] every element of the test for the spoliation inference" where evidence was destroyed "before [defendant] knew or should have known that litigation was imminent"). Thus, any sanction for spoliation must follow a finding that Defendants were under a duty to preserve evidence.

Second, a showing of "bad faith" is "a prerequisite to imposing sanctions for the destruction of evidence." *Trask-Morton*, 534 F.3d at 681. "'[B]ad faith' means destruction for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998); *see also Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013), *reh'g denied* (May 1, 2013), *cert. denied*, 134 S. Ct. 900 (2014) (citation omitted) ("A party destroys a

document in bad faith when it does so for the purpose of hiding adverse information."). Sanctions for spoliation thus may not be imposed simply because evidence was destroyed; instead, such sanctions are appropriate only if the evidence was destroyed for the purpose of hiding adverse information. *See, e.g.*, *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002) (citation omitted) ("[T]he crucial element is not that evidence was destroyed but rather the reason for the destruction."); *accord, e.g.*, *F.T.C. v. Asia Pac. Telecom, Inc.*, 788 F. Supp. 2d 779, 790 (N.D. Ill. 2011) (citations omitted) ("A court's inherent power to impose spoliation sanctions arises only if a party destroyed evidence in bad faith. In the context of destroying evidence, 'bad faith' means 'destruction for the purpose of hiding adverse information.'"). The movant bears the burden to make this showing. *Bracey*, 712 F.3d at 1019.

Based on the above authority, Plaintiff must establish 1) that Defendants Kelley and Charles had a duty to preserve evidence because they knew or should have known that litigation was imminent; and 2) that while under this duty, Defendants destroyed evidence in bad faith, in that they did so for the purpose of hiding adverse information.

### 1. Duty

"A party has a duty to preserve evidence when it knows, or should have known, that litigation was imminent." *Trask–Morton*, 534 F.3d at 681. "At the latest, this duty attaches when the plaintiff informs the defendant of his potential claim." *Chandler v. Buncich*, No. 2:12 CV 175, 2012 WL 4343314, at *1 (N.D. Ind. Sept. 24, 2012). The duty may arise "even prior to the filing of a complaint as long as it is known that litigation is likely to commence." *MacNeil Auto. Products, Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 801 (N.D. Ill. 2010).

19

**a. Defendant Kelley's Duty**

Plaintiff amended its complaint to name Kelley as a defendant on April 8, 2013. [Dkt. 13.] Kelley was served with the amended complaint on April 28, 2013, [Dkt. 16 at 1], and the alleged deletion occurred on December 22, 2013. [*See, e.g.*, Dkt. 130 at 3.] Because the duty to preserve evidence attaches, "at the latest" when "the plaintiff informs the defendant of his potential claim," *Chandler*, 2012 WL 4343314, at *1, Kelley was plainly under a duty to preserve evidence at the time of the alleged deletion.

**b. Defendant Charles' Duty**

Plaintiff amended its complaint to name Charles as a defendant on May 5, 2014. [*See* Dkt. 124.] Hence, at the time of the deletion, Charles Tashiro was not a defendant in this action. Nonetheless, the Court finds that, at the time of the deletion, Charles "knew, or should have known, that litigation was imminent." *Trask–Morton*, 534 F.3d at 681.

In response to Plaintiff's supplement to its motion for sanctions, Defendant Charles executed a declaration in which he stated that he was the holder of the Tashiros' Comcast account, and that any emails about the account or potential litigation would have been sent to his email address. [Dkt. 161 ¶¶ 2-4.] He added that he did "not recall receiving any DMCA notices," but the deposition testimony from Comcast's 30(b)(6) confirms that seven such notices were sent. [*See* Hr'g Tr. 61:22-63:6; *see also* Pl.'s Ex. 50 at 29:5-13 (Dep. of Colin Padgett).] Thus, regardless of whether Charles "recall[ed]" receiving the communications from Comcast, the repeated notices of infringement sent to his email address should have put him on notice that an infringement suit was likely, particularly after such a lawsuit was initiated against his wife.

Next, both Defendants "utilized the same internet account at all relevant times," [Dkt. 161 at 1], and, after the filing of Plaintiff's original suit, Defendant Kelley "showed [Defendant

Charles] a copy of the complaint." [Hr'g Tr. 72:17-20.] Defendant Charles also admitted 1) that

he used BitTorrent before this lawsuit began, [Dkt. 107-2 at 2 (Charles Dep. 26:7-14)], and 2)

that he had previously visited Plaintiff's X-Art website. [Charles Dep. 52:22-24.] Thus, at the

time of the deletion, Charles knew that his wife had been sued for infringing the movies on the

same website (X-Art) that he himself had visited; via the same protocol (BitTorrent) that he

himself had used; and by means of the same internet account (the Tashiros') for which he had

provided the associated email address. A reasonable person in that situation would know that

litigation against him was "likely" to commence, *MacNeil*, 715 F. Supp. 2d at 801, such that at

the time of the deletion, Defendant Charles had a duty to preserve evidence.

Finally, other courts have noted that the duty to preserve evidence "certainly arises upon

a formal discovery request." *Am. Family Mut. Ins., Co. v. Roth*, No. 05 C 3839, 2009 WL

982788, at *11 (N.D. Ill. Feb. 20, 2009). In this case, Plaintiff served its discovery requests on

Defendant Kelley well before December 22, 2013, [*see, e.g.*, Dkt. 76-2 at 10], and Plaintiff

explained that its requests were not limited only to Kelley as an individual. [*See, e.g.*, 161-1 at 3

(defining the terms "you" and "your" to include both the person receiving the request and "any

other person(s) or entity(ies) acting or purporting to act on your behalf or under your control").]

As explained below, Kelley then delegated to Charles much of the responsibility for responding

to Plaintiff's discovery requests. *See infra* part II.A.2.b.ii. Charles was therefore acting on

Kelley's behalf at the time of the alleged spoliation, such that he was subject to Plaintiff's

discovery requests. The Court concludes that Plaintiff's discovery requests, in combination with

the other considerations discussed above, were enough to put Charles on notice that he had a

duty to preserve evidence. This is true regardless of whether Charles was a party to this litigation

at that time, *see, e.g.*, *Chandler*, 2012 WL 4343314, at *1 (noting that duty can arise before filing of complaint), and Charles is therefore potentially liable for spoliation.

### 2. Bad-Faith Destruction of Evidence

At the hearing, the parties stipulated that Defendant Charles had deleted files from the Stover drive before the drive was produced for imaging by Quantum Discovery. [Hr'g Tr. 108:3-11.] As noted above, however, sanctions for spoliation of evidence can be entered only if the culpable party destroyed evidence in bad faith. *Trask-Morton*, 534 F.3d at 681. Bad faith "means destruction for the purpose of hiding adverse information." *Mathis*, 136 F.3d at 1155. In this case, then, Plaintiff must show bad faith, and thus must establish that Defendants deleted files "for the purpose of hiding adverse information." *Norman-Nunnery*, 625 F.3d at 428. Because it was Defendant Charles who physically deleted the files, [Hr'g Tr. 108:10-11], the Court first addresses Defendant Charles' culpability.  The Court then considers whether sanctions against Defendant Kelley are appropriate.

### a. Defendant Charles

Charles stipulated at the hearing that he 1) withheld the Western Digital hard drive from his wife, such that it was not included in Defendants' initial responses to Plaintiff's discovery requests; and 2) deleted the files from the Stover drive on the night of December 22, 2013. [Hr'g Tr. 108:3-11.] As part of that stipulation, Plaintiff agreed not to question Charles about the reason for the deletion. [Hr'g Tr. 108:13-17] The hearing thus did not include any explicit testimony about whether Charles acted in bad faith when deleting the files.

The lack of such testimony, however, is not dispositive. "'Bad faith' is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference." *Mathis*, 136 F.3d at 1155; *see also Davis v. Carmel Clay Sch.*, No. 1:11-CV-00771-SEB-DML, 2013 WL

5487340, at *6 (S.D. Ind. Sept. 30, 2013) (same). Thus, the Court may infer bad faith from the circumstances of the destruction of evidence. *See Mathis*, 136 F.3d at 1155; *see also Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-CV-1122, 2014 WL 201534, at *7 (C.D. Ill. Jan. 17, 2014) ("The way to determine whether evidence was destroyed in order to hide adverse information is . . . [to] infer bad intent based upon when the destruction occurred in relation to the destroyer's knowledge that the evidence was relevant to potential litigation."). In this case, the circumstances of the files' deletion support an inference that Charles acted in bad faith when he destroyed the files.

First, Defendants had a strong motive to erase the files at issue. This motive arises from the strength of Plaintiff's underlying copyright infringement claim and the associated risk of liability for Defendants. To prevail on their copyright claim, Plaintiff must show "(1) ownership of a valid copyright; and (2) unauthorized copying of constituent elements of the work that are original." *Hobbs v. John*, 722 F.3d 1089, 1094 (7th Cir. 2013) (quoting *Peters v. W.*, 692 F.3d 629, 632 (7th Cir. 2012)).

Plaintiff established the first element through the parties' stipulation that Malibu Media owns the copyrights at issue. [Hr'g Tr. 192:4-6.] Plaintiff then addressed the second element through its examination of Defendant Charles, during which the following exchange occurred:

> Q: Mr. Tashiro, did you intentionally fail to tell the truth during your deposition in this case?
> A: No.
> Q: I am sorry, no?
> A: What was the question again? I am sorry.
> Q: Did you intentionally fail to tell the truth during your deposition in this case?
> A Did I intentionally?
> Q: Yes.
> THE COURT: You can instruct him.
> MS. RUSSELL: Your Honor, this is where Mr. Tashiro is fumbling, I believe, to invoke his Fifth Amendment privilege.
> THE WITNESS: That's correct.

MS. RUSSELL: Then you need to say that for the record.

THE WITNESS: I wish to invoke my Fifth Amendment privilege.

BY MR. LIPSCOMB:

Q: Did you intentionally answer any request for admission inaccurately?

A: Yes.

MS. RUSSELL: Mr.—

THE WITNESS: Again, I wish to invoke my Fifth Amendment privilege. Sorry, Your Honor.

THE COURT: That is all right.

BY MR. LIPSCOMB:

Q: At any time in this case, did you intentionally fail to investigate certain facts so that you could claim ignorance of them?

A: Again, I wish to assert my Fifth Amendment privilege.

    . . .

Q: Did you agree directly with your wife to hide the truth in this case?

A: Again, I wish to assert my Fifth Amendment privilege.

Q: Did you implicitly agree with your wife to hide the truth in this case?

A: Fifth Amendment privilege.

Q In your deposition, you testified that you had not used BitTorrent except on Ed Stover's drives, correct?

A: I assert my Fifth Amendment privilege.

Q: And in your deposition, you said you only used it for certain purposes, BitTorrent; isn't that correct?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you ever use BitTorrent to download movies?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you ever use BitTorrent to download adult movies?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you ever use BitTorrent to download music?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you ever use BitTorrent to download Plaintiff's adult movies?

A: I wish to assert my Fifth Amendment privilege.

Q: Have you turned over all hard drives that were used in your house from January 12—or 16—what is it, January 14, 2012, to January 16, 2013?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you review the discovery that we propounded—that we sent to your wife?

A: I am sorry. Say it again.

Q: Did you review the interrogatories which are written questions that we sent to your wife?

A: I wish to assert my Fifth Amendment privilege.

Q: Did you review the request for documents that we sent to your wife?

    . . .

THE WITNESS: I wish to assert my Fifth Amendment privilege.

BY MR. LIPSCOMB:

Q: Did you know at the time she certified that no copyright alert notices had been received, that you had received them?

> A: I wish to assert my Fifth Amendment privilege.
> Q: Have you ever watched movies that you downloaded via BitTorrent with your wife?
> A: I wish to assert my Fifth Amendment privilege.
> Q: Have you ever watched adult movies which you downloaded via BitTorrent with your wife?
> A: I wish to invoke my Fifth Amendment privilege.
> Q: Have you ever listened to music which you downloaded via BitTorrent with your wife?
> A: I wish to assert my Fifth Amendment privilege.
> MR. LIPSCOMB: May I have one minute?
> THE COURT: You may, you may.
> MR. LIPSCOMB: One more question on that line.
> Thank you, Mr. Cooper.
> BY MR. LIPSCOMB:
> Q: Did you ever watch Plaintiff's adult movies that you downloaded via BitTorrent with your wife?
> A: I wish to assert my Fifth Amendment privilege.

[Hr'g Tr. 115:8-121:1.] This colloquy has extensive evidentiary significance. As the Supreme Court has explained, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause.'" *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (quoting 8 J. Wigmore, Evidence 439 (1961)); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals, including our own, in the two decades since *Baxter* was decided.").

In this case, then, the Court may infer that, each time Charles invoked his Fifth Amendment right to silence, the answer that he withheld would have been unfavorable. Thus, because Charles refused to answer whether he "ever use[d] BitTorrent to download Plaintiff's adult movies," [Hr'g Tr. 118:20-21], the Court may infer that Charles did in fact use BitTorrent to download Plaintiff's adult movies. Likewise, because Charles refused to answer whether he

25

"ever watch[ed] Plaintiff's adult movies that [he] downloaded via BitTorrent," [Hr'g Tr. 120:24-121:1], the Court may infer that Charles did in fact download and watch Plaintiff's adult movies. This, in turn, indicates that Charles engaged in "unauthorized copying of constituent elements of [Plaintiff's] work." *Hobbs*, 722 F.3d at 1094; *accord, e.g.*, *Malibu Media, LLC v. Etter*, No. 1:12-CV-01115-TWP, 2013 WL 6178626, at *2 (S.D. Ind. Nov. 25, 2013) (acknowledging that use of BitTorrent can constitutes copyright infringement). As such, Plaintiff put forth evidence that tended to establish the second and final element of its copyright infringement claim.

Notably, Charles' silence itself is not enough—standing alone—to infer that Charles infringed Plaintiff's copyrighted works. Shortly after deciding *Baxter*, the Supreme Court noted that Fifth Amendment silence is "only one of a number of factors to be considered by the finder of fact in assessing a penalty[.]" *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5 (1977). "Thus, although the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them, an analysis of that evidence is nonetheless required." *LaSalle*, 54 F.3d 390 (citations and quotation marks omitted).

Here, however, Charles' silence was not the only evidence of his liability in Plaintiff's underlying copyright infringement case, as Plaintiff bolstered the strength of its infringement claim through testimony from Michael Patzer. As described above, this witness testified that IPP had recorded a person with an IP address of 98.222.184.69 engaging in infringing transactions involving Plaintiff's copyrighted works. [*See, e.g.,* Hr'g Tr. 202:2-3 ("Yes, yes. The IP address is in our records referring to Malibu Media content, movies.").] Because the IP address later proved to correspond to the Tashiros' internet account, [*see* Dkt. 14-2], Patzer's testimony increased the likelihood that Defendant Charles had in fact infringed Plaintiff's copyrights. The Court may

26

thus infer from Mr. Patzer's testimony and from Defendant Charles' numerous invocations of his Fifth Amendment rights that Defendant Charles faced a strong prospect of liability in Plaintiff's underlying lawsuit, such that he likely took action to escape that liability. As such, Defendant Charles likely deleted the files from the hard drive for the purpose of hiding adverse evidence, and his actions were accordingly done in bad faith. *See Mathis*, 136 F.3d at 1155.

Charles' invocation of his Fifth Amendment rights in response to other questions also supports this conclusion. As noted above, Charles refused to answer whether he "intentionally fail[ed] to investigate certain facts so that [he] could claim ignorance of them," whether he "agree[d] with [his] wife to hide the truth in this case," and whether he "review[ed] the discovery that [Plaintiff] propounded" upon his wife. [Hr'g Tr. 116, 118-19.] Again, the Court may infer from this refusal that Charles did in fact refrain from investigating certain facts and did in fact agree to "hide the truth" in this case. This, in turn, implies that Charles knew or suspected that Plaintiff would be able to uncover damaging evidence, such that his later decision to withhold the Western Digital drive and to delete files from the Stover drive was made for the purpose of hiding that damaging evidence. As a result, Charles' conduct was done in bad faith, *see Mathis*, 136 F.3d at 1155, and his conduct is therefore sanctionable.

Next, the timing of the deletion suggests that Charles acted in bad faith. As district courts have previously observed, the timing of the destruction of evidence can support a finding of bad faith. *See, e.g.*, *Sokn*, 2014 WL 201534, at *7 (C.D. Ill. Jan. 17, 2014) ("[A court may] infer bad intent based upon when the destruction occurred in relation to the destroyer's knowledge that the evidence was relevant to potential litigation."). In this case, the timing of the deletion of files could hardly be more damning: When Patrick Paige examined the hard drive at issue, he determined that "numerous files and folders associated with BitTorrent use were ___*deleted*___ from

27

the hard drive on December 22, 2013 at approximately 10:00 pm—the night before the hard

drive was turned over to Quantum Discovery for imaging." [Dkt. 76-1 ¶ 25 (emphasis original).]

This suggests that Charles was not simply using the hard drive in the normal course of business

when a deletion accidentally occurred; instead, it appears that Charles deleted files in a

calculated attempt to hide adverse evidence at the last instant before the hard drive passed out of

Defendants' possession. As a result, the timing of the deletions is strong evidence that Charles'

conduct is sanctionable. *Accord, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497,

504 (D. Md. 2010) (Grimm, Mag. J.) ("The fact that [defendant's president] undertook to delete

these inculpatory files from his work computer . . . only days before a scheduled imaging of his

work computer's contents compels the conclusion that he was knowingly engaged in efforts to

destroy evidence that he regarded as harmful to Defendants and beneficial to Plaintiff."); *id.* at

510 ("[T]he timing of the bulk of the deletions immediately prior to the scheduled discovery

hearing suggests to me that [defendant's president] deleted the files to prevent their discovery.").

      Next, the nature of the deleted files also implies that Charles deleted the files to hide

adverse information. Plaintiff's expert witness examined the hard drive at issue and determined

that "numerous files and folders *associated with BitTorrent use*" were deleted. [Dkt 76-1 ¶ 25

(emphasis added).] From the deleted files, he "recovered seventy-three (73) BitTorrent files,"

many of which were "associated with adult movies." [*Id.* ¶ 26.] Other recovered files included

those that "enable[d] the BitTorrent protocol to work." [*Id.*]

      Plaintiff's expert report thus indicates that the files Charles deleted were exactly those

files that exposed him to liability. Plaintiff, that is, accused Defendants of using the BitTorrent

file distribution network to infringe its copyrights in various adult movies, [*see* Dkt. 124 (Second

Am. Compl.)], and Charles subsequently deleted those files that were "associated with

28

BitTorrent use" and that were "associated with adult movies." [Dkt. 76-1 ¶¶ 25-26.]  This congruence renders it unlikely that the deletion was merely accidental or negligent; instead, as Plaintiff notes, the lack of any other "explanation for why only some files were deleted but not others," [Dkt. 139 at 3], allows the Court to infer that Defendants intentionally targeted the files at issue because they contained adverse information. *Accord, e.g.*, *Victor* Stanley, 269 F.R.D. at 509-10 (discussing names of deleted files and concluding that, "[g]iven the file names, it is evident that the files were relevant and would have supported Plaintiff's case, and . . . that Defendants breached their duty to preserve potentially relevant ESI"). Again, then, the reasonable conclusion is that Charles' actions were carried out in bad faith.

Defendants' expert report does not disturb this conclusion: Defendants note that their expert allegedly recovered files from the hard drive at issue and found "not a single Malibu Media related file on that drive." [Dkt. 137.] This finding, however, does not change the fact that the recovered files *were* related to BitTorrent use and *were* related to adult content of the sort that Plaintiff produces. [*See* Dkt. 76-1 ¶¶ 25-26.] Thus, Defendant Charles' deletion was a targeted attempt to delete those files that were most incriminating, such that he **was** trying to destroy adverse evidence.[12]

Next, the Seventh Circuit has previously observed that a party may a resist a finding of bad faith by establishing alternative explanations for destruction or loss. *See, e.g.*, *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001) (noting that "loss or destruction of records through a business retention-destruction schedule does not impute any bad faith or

---

[12] In addition, as explained more fully *infra*, the Court finds that Defendants' expert was not as credible as Plaintiff's expert. The Court thus doubts the accuracy of Defendants' expert's claim that he was able to recover **all** files that Charles deleted. This, in turn, leaves open the possibility that Plaintiff's copyrighted movies were in fact among the deleted files. [*See* Dkt. 76-2 ¶ 28 (Decl. of Pl.'s Expert) ("Malibu Media, LLC's copyrighted content could have been deleted from the drive during the Defendant's mass erasure the night before the computer devices were turned over to Quantum Discovery.").]

consciousness of guilt"); *Mathis*, 136 F.3d at 1155 (acknowledging existence of a "competing explanation" in considering whether loss of evidence was benign). In this case, however, Defendants offered no evidence of any legitimate reason or pre-existing practice that might have led to the deletion of the files at issue. Their response to Plaintiff's motion admits that files were deleted, [*see, e.g.*, Dkt. 137 at 4], and merely suggests that any deletion was an "accident" or "negligent." [*Id.* at 8.] Defendants do not explain how such an accidental deletion may have occurred, and at the hearing, Defendant Charles specifically avoided testifying about why the deletion occurred. [*See* Hr'g Tr. 108:13-17.] Moreover, Plaintiff notes that there "was no automatic process in place to erase files" on December 22, 2013, [Dkt. 139 at 3], such that this case is distinguishable from *Rummery*, 250 F.3d 553, and other cases, in which pre-existing document destruction policies precluded a finding of bad faith.

The Court acknowledges that the burden remains on Plaintiff to prove destruction in bad faith, *see Bracey*, 712 F.3d at 1019, but the above-described absence of any alternative explanation for the deletion is nonetheless a factor that weighs against Defendants. *See, e.g.*, *S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co.*, 695 F.2d 253, 259 (7th Cir. 1982) (noting that court may rely on "totality of the circumstances" to infer bad faith). Thus, the lack of any benign explanation for the deletion of the files—in conjunction with the reasons previously explained—confirms the Court's determination that Defendant Charles deleted the files for the purpose of hiding adverse information.[13] As such, the Court concludes that Defendant Charles spoiled evidence.

---

[13] The closest Defendants came to asserting an alternative explanation consisted of testimony at the hearing indicating that Defendant Charles may have been concerned about relinquishing the Western Digital hard drive because it may have contained explicit pictures and/or video files of Defendants themselves. [*See* Hr'g Tr. 90:20-91:4; *see also* Hr'g Tr. 102:1-7.] Defendants' expert Delvan Neville, however, testified to having reviewed every movie deleted from the hard drive, and he did not reveal the existence of any "home movies" involving the Tashiros. [Hr'g Tr. 233:1-236:19.] Likewise, Plaintiff's expert Patrick Paige also failed to note the existence of such movies among those files that he was able to recover from the drive. [Hr'g Tr. 141:6-144:17.] At a minimum, this

Defendants oppose this conclusion on the grounds that no spoliation occurred because all files that Charles deleted were recoverable. [Dkt. 137 at 4.] They claim that when Charles deleted the files on December 22, 2013, the files were merely "*marked* as deleted," and that they were still "fully accessible and not destroyed." [*Id.* (emphasis original)] They explain that a file that is "marked" as deleted is recoverable until the file is later overwritten, and they maintain that none of the deleted files at issue were ever overwritten. [*Id.* at 5.] They thus argue that—in the absence of any **permanent** deletion or loss of files—the Court cannot find that any spoliation occurred. [*See id.*]

At the hearing, the parties' experts presented conflicting testimony about whether the deleted files were recoverable. Plaintiff's expert, Patrick Paige, testified that "[t]here were thousands of files that were overwritten and unrecoverable[.]" [Hr'g Tr. 152:12-13; *see also* Hr'g Tr. 154:22-23 ("There were thousands of files that were overwritten.").][14] In contrast, Delvan Neville testified for Defendants that "all of the files that were deleted [were] recoverable," and that "none of those files [were] permanently destroyed[.]" [Hr'g Tr. 232:23-233:3.]

The Court finds Patrick Paige's testimony to be more credible than Delvan Neville's. Previously, Plaintiff moved to preclude Neville from testifying on the grounds that Neville was not an expert in computer forensics. [Dkt. 142] The Court denied that motion, but noted that Plaintiff would have the opportunity to attack Neville's credentials and methods at the time that Neville testified. [*See* Dkt. 164 at 9.]

---

demonstrates a clear intent by Defendant Charles to delete far more evidence than any personal content involving himself and his wife. In addition, it is noteworthy that even though counsel for Defendants notified the Court prior to the April 30, 2015 evidentiary hearing of the possible existence of explicit material involving the Tashiros, Defendants to date have not sought a protective order to preclude dissemination of this material, despite the Magistrate Judge's invitation for them to do so.

[14] Somewhat bewilderingly, Defendant Kelley's counsel argued at the supplemental hearing that "it is uncontroverted that [the files at issue] were not actually destroyed." [Supp. Hr'g 32 Tr. 4-5.] Mr. Phillips may not care for the substance of Patrick Paige's testimony, but ignoring the testimony will not make it go away.

At the hearing, Plaintiff's counsel did just that: Plaintiff first established that Neville was a Ph.D. student in a field unrelated to computer forensics, [Hr'g Tr. 240:3-6], and that Neville had not studied computer forensics as an undergraduate. [Hr'g Tr. 240:9-11.] Neville then revealed that his training in computer forensics consisted of a single online course that was approximately three hours long and that did not involve rigorous evaluation of its participants. [Hr'g Tr. 240:20-241:4; 242:4-9.] Further, although Neville indicated that he had a background in computer repair and troubleshooting, this background was not strongly related to computer forensics. [*See, e.g.*, Hr'g Tr. 241:5-7 ("Q: You have never worked under the supervision of any other computer forensic expert, have you? A: Correct.").]

Plaintiff's expert, in contrast, testified that he was a detective in the Palm Beach County Sheriff's Department computer crimes unit from 2000 to 2011. [Hr'g Tr. 132:10-16.] During that time, he "conduct[ed] forensic computer exams" for the FBI, the Secret Service, the ATF, and other organizations. [Hr'g Tr. 132:21-133:8.] He also testified that he took "over 400 hours of courses designed to teach people how to investigate computers," and that he himself had taught a number of such courses. [Hr'g Tr. 134:4-10.] Finally, he explained that he had received numerous awards, including the 2002 and 2007 Department of Justice Outstanding Officer of the Year awards. [Hr'g Tr. 134:25-135:16.]

Based on the relative credentials of the parties' experts, the Court concludes that Patrick Paige's testimony is more accurate and more credible. As such, the Court finds it highly likely that thousands of files **were** deleted and **were** unrecoverable. This confirms that Defendant Charles did not temporarily delete relevant evidence; instead, he permanently destroyed that evidence. As a result, Charles is liable for spoliation.

Next, even if the files that Charles deleted **had** been recoverable, this would not absolve Charles of liability. At the outset, the Court acknowledges that certain cases in this Circuit seemingly indicate that a **permanent** loss of evidence is a prerequisite to a finding of spoliation. In *YCB International, Inc. v. UCF Trading Co.*, the court wrote that the party seeking spoliation sanctions must "first establish that discoverable information has been lost." No. 09-CV-7221, 2012 WL 3069683, at *9 (N.D. Ill. June 12, 2012). The Northern District of Indiana then cited this statement for the proposition that spoliation sanctions were not appropriate where "the [plaintiffs] were able to recover the [relevant] data," such that "the evidence [had] not been destroyed, altered, or spoliated." *Exe v. Fleetwood RV, Inc.*, No. 1:11-CV-70, 2013 WL 5460293, at *9 (N.D. Ind. July 26, 2013).

The court's conclusion in *Exe* misapplies the statement from *YCB*. The latter case relied on the Seventh Circuit's statement that "[s]poliation of evidence occurs when one party destroys evidence relevant to an issue in the case. Spoliation of evidence does not apply in this case because the [evidence at issue] **shed no light on Smith's claims**[.]" *YCB International*, 2012 WL 3069683, at *9 (emphasis added) (quoting *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002)). The point in *YCB*, then, was not that the evidence at issue was recoverable; instead, the point was that the evidence was not **relevant**. Indeed, the *YCB* court even noted that the overarching spoliation issue was whether the culpable party had "destroyed [relevant emails], irretrievably **or otherwise**." *Id.* at *9 (emphasis added). The court thus implicitly acknowledged that—**had** the destroyed information been relevant—then recovery of that information would **not** have precluded a spoliation sanction.

Defendant's counsel also argued at the supplemental hearing that two other cases— *Bracey v. Grondin*, 712 F.3d 1012 (7th Cir. 2013) and *Davis v. Carmel Clay Sch.*, No. 1:11-CV-

00771-SEB-MJD, 2013 WL 5487340 (S.D. Ind. Sept. 30, 2013)—support the proposition that spoliation occurs only if evidence is permanently destroyed. [Supp. Hr'g Tr. 31:14-25.] Neither case is on point.

In *Bracey*, the Seventh Circuit discussed spoliation and noted as a general matter that a party may be entitled to an adverse inference instruction "when a party intentionally destroys evidence in bad faith." 712 F.3d at 1018. It added that "[w]hen considering the propriety of such an adverse inference instruction, the crucial element is not that the evidence was destroyed but rather the reason for the destruction." *Id.* at 1019 (alteration and quotation marks omitted). From these statements, Defendants apparently conclude that permanent destruction is a necessary prerequisite for spoliation, but this reads the case too broadly: the relevant evidence in *Bracey*— a portion of video footage—had unquestionably been permanently destroyed, *see id.* at 1015 (noting that footage had been overwritten), and so the Seventh Circuit had no cause to consider whether spoliation sanctions would have been appropriate had the footage been recovered. The mere fact that permanent destruction was sufficient for spoliation in *Bracey* does not establish that permanent destruction is necessary for spoliation in other cases.

*Davis v. Carmel Clay Schools* is also inapposite. There, the court briefly noted that certain allegedly deleted video footage had been recovered, 2013 WL 5487340, at *5, but the court ultimately determined that no spoliation had occurred because the moving party had put forth no evidence of bad faith. *Id.* at *7. Thus, Defendants may adamantly assert that *Davis* proves that permanent destruction is a necessary prerequisite for spoliation, [Supp. Hr'g. Tr. 31:24-32:3], but nowhere in *Davis* did the court rely on this proposition for its conclusion. *See* 2013 WL 5487340, at *6-7.

In addition, other courts have been much more explicit that mere attempts to destroy or withhold evidence constitute spoliation: as one court has observed, sanctions for "obstructing or failing to comply with discovery procedures would be hollow indeed if they could be imposed only on those whose efforts at concealment proved to be successful." *Nittolo v. Brand*, 96 F.R.D. 672, 676-77 (S.D.N.Y. 1983). One party "may not properly escape the consequences of his own wrongful conduct" simply because the other party was "diligent and persistent enough to overcome the obstacles which he placed in their path." *Id.* Thus, even if Plaintiff in this case **had** been able to recover all files that Charles deleted, sanctions would still be appropriate. *Accord, e.g.*, *Pac. Coast Marine Windshields Ltd. v. Malibu Boats*, LLC, No. 6:12-CV-33-ORL-28DAB, 2012 WL 10817204, at *9 (M.D. Fla. Nov. 30, 2012) ("[D]eleting files on the eve of producing the hard drive must be sanctioned as a deterrent to others who may contemplate disobeying court orders and destroying evidence, even if when [sic] the evidence is recoverable[.]").

Moreover, courts have repeatedly acknowledged that mere deletion of files has evidentiary ramifications. In *Krumwiede v. Brighton Associates, L.L.C.*, for example, the court explained that "if a file is moved or read or deleted, the original file entry will be changed" and "the metadata contained in the entry changes." No. 05 C 3003, 2006 WL 1308629, at *4 (N.D. Ill. May 8, 2006). This makes "it impossible to verify that the [deleted] file is identical to the original, even if the file's content appears unchanged." *Id.* Thus, even if a deleted file is not permanently unrecoverable, "the changes to the file metadata call the authenticity of the files and their content into question and make it impossible for [a party] to rely on them." *Id.* at * 10.

In this case, then, even if many files on the Stover drive had been recoverable, the metadata associated with those files would have been altered. This alteration would impede Plaintiff's use of those files in proving its underlying claim of copyright infringement, such that

sanctions for the alteration of this evidence would be appropriate. *See Krumwiede*, 2006 WL 1308629, at *10-11; *accord, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 482 n.16 (E.D. Va. 2011) ("[I]t is not correct that recovery of a deleted email forecloses a finding that it had been deleted. The fact of deletion has evidentiary significance, and [defendant's expert] is simply wrong in asserting that recovery of a deleted email negates the fact that it was deleted."); *In re Hitachi Television Optical Block Cases*, No. 08CV1746 DMS NLS, 2011 WL 3563781, at *5 n.7 (S.D. Cal. Aug. 12, 2011) (citation omitted) ("Hitachi takes great pains to argue that since deletion of the files does not equal complete elimination or destruction, and the documents were eventually capable of retrieval, there was no spoliation. The alteration of the document through deletion, however, constitutes spoliation.").

Next, the Seventh Circuit has implicitly acknowledged that recovery of deleted or destroyed evidence does not preclude entry of sanctions. As explained in *Barnhill v. United States*, some misconduct "may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." 11 F.3d 1360, 1368 (7th Cir. 1993) (footnote omitted). Thus, a court may use its inherent powers to dismiss a case or enter default judgment even when the innocent party "incur[s] no real inconvenience" and "suffer[s] no real prejudice." *Id.*

Here, Defendants argue that, because the deleted files were purportedly recoverable, "Malibu was not prejudiced" and "[t]here was no damage done by the purported spoliation." [Dkt. 137 at 10.] As *Barnhill* indicates, however, the absence of such prejudice is not dispositive. By attempting to hide or destroy evidence, Defendant Charles attempted to work a fraud on this

Court, obstruct Plaintiff's pursuit of its case, and subvert the judicial process. Defendant Charles' wrongdoing thus strikes at the "integrity and credibility of the civil justice system," 11 F.3d at 1368, and so even if Charles' conduct had **not** harmed Plaintiff, the Court would not allow his attempted fraud to go unpunished.

Finally, the Court's conclusion is consistent with the general principles underlying litigation in the federal courts. Discovery in the federal system is intended "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the **fullest practicable extent**." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (emphasis added). The rules governing discovery contemplate that parties will "obtain **the fullest possible knowledge** of the issues and facts before trial," such that "civil trials in the federal courts no longer need be carried on in the dark." *Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

Charles' conduct is simply not consistent with these principles. By deleting files from the Stover drive, Charles chose to conceal—not disclose—potentially relevant information. And by doing so, Charles deprived Plaintiff of the ability to gain the "fullest possible knowledge" of the facts relevant to Plaintiff's underlying copyright claim. Charles thus flouted the important principles underpinning litigation carried on before this Court and other courts in the federal system, and his decision to do so cannot go unpunished.

### b.  Defendant Kelley

The Court now considers Defendant Kelley's culpability in the above-described misconduct. Defendant Kelley's liability arises from two sources. First, Defendant Kelley's failure to investigate her responses to Plaintiff's discovery requests constitutes sanctionable conduct regardless of any spoliation of evidence. Second, Defendant Charles' misconduct is attributable to Kelley, such that Charles' misconduct warrants sanctions against Kelley as well.

37

### i.       Failure to investigate

A party has a duty to reasonably investigate whether responses to an opposing party's discovery requests are complete. *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 145 (N.D. Ill. 1982) ("[The Rules of Civil Procedure] require[] that parties take reasonable steps to ensure that their responses to requests to produce are complete and accurate."); *see also Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 376 (S.D. Ind. 2009) (same); *accord, e.g.*, *3M Innovative Properties Co. v. Tomar Electronics*, No. CIV 05-756 MJD/AJB, 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006) ("In light of the Supreme Court's directive that discovery under the federal rules requires a complete disclosure of relevant facts known to the parties, parties are under a duty to complete a reasonable investigation when presented with the opposing party's interrogatories and document requests."); *Smithfield Bus. Park, LLC v. SLR Int'l Corp.*, No. 5:12-CV-00282-F, 2013 WL 5705601, at *4 (E.D.N.C. Oct. 18, 2013) (same). When a party fails to fulfill these obligations, the Court may use its inherent power to enter appropriate sanctions. *See, e.g.*, *Armstrong v. Amstead Indus.*, Inc., No. 01 C 2963, 2004 WL 1497779, at *2 (N.D. Ill. July 2, 2004) (citation and quotation marks omitted) ("Courts have an inherent power to sanction a range of litigation abuses—including discovery abuses—to ensure the orderly and expeditious disposition of cases."); *accord, e.g.*, *3M Innovative Properties*, 2006 WL 2670038, at *6 (finding that sanctions were appropriate where, inter alia, party "presented no evidence . . . that it [had] conducted a reasonable investigation for responsive information or documents").

In this case, Defendant Kelley was under an obligation to reasonably investigate whether her responses to Plaintiff's interrogatories and requests for production were complete. At the hearing, however, the following exchange took place:

> Q: Did you investigate whether your answers to your interrogatories were truthful prior to signing them?

38

A: I am not sure I understand. Could you repeat that, please?
Q: Did you investigate whether your answers to your interrogatories were truthful prior to signing them?
A: No.
Q: You did not investigate?
A: No.

[Hr'g Tr. 14:12-20.] Defendant Kelley's own counsel tried to clarify these statements, but he elicited only the following responses:

Q: So the first [question] that I have, you remember [Plaintiff's counsel] asking you about whether or not you investigated the interrogatory answers before you submitted them to, or before they were submitted, sorry, to Malibu Media?
A: Yes.
Q: And you remember stating that you did not investigate?
A: Correct.
Q: What do you mean that you didn't investigate? Did anyone investigate?
A: No.
Q: Did you consult anyone regarding interrogatory answers besides your own personal memory?
A: No.

[Hr'g Tr. 89:3-15.] Moreover, as noted above, Plaintiff's counsel notified Defendants about the existence of the Western Digital hard drive that had not been disclosed in Defendant Kelley's initial answers to Plaintiff's interrogatories. [*See* Dkt. 130-3 at 3 (email to attorney Phillips[15]).]

Plaintiff's counsel then inquired about Kelley's subsequent actions:

Q: Did you look for that drive after we told you that we knew it existed?
A: No.
Q: You performed no search of your house for it at all?
A: No.

[Hr'g Tr. 23:13-17.] Defendant Kelley's own testimony thus demonstrates that she repeatedly failed to discharge her duty to reasonably investigate whether her discovery responses were complete and accurate, and sanctions against Kelley are therefore appropriate. *See, e.g.*, *3M Innovative Properties*, 2006 WL 2670038, at *6; *see also Morris v. McMaster-Carr Supply Co.*,

---

[15] Phillips later represented to the Court that he communicated this notification to Defendant Kelley. [Supp. Hr'g Tr. 47:22-48:4.]

No. 01 C 6349, 2002 WL 1290390, at *2 (N.D. Ill. June 10, 2002) ("Parties must take reasonable steps to ensure that they provide complete and accurate information in discovery. So negligence or inadvertence, not just bad faith or willfulness, is sanctionable.").

Additionally, Kelley's failure to investigate was especially egregious in light of her attorney's[16] representations to the contrary. In October 2013, Plaintiff's counsel informed attorney Phillips that Kelley's discovery responses were overdue. [Dkt. 130-3 at 1.] Phillips responded by stating that the delay occurred because he was waiting to "hear back [from his client] to ensure the responses were 100% accurate." [*Id.* (emphasis original).] In April 2014, Plaintiff's counsel informed attorney Phillips that Plaintiff had learned of the existence of the undisclosed Western Digital hard drive. [*Id.* at 5.] Phillips responded that "[m]y client is unaware of these drives, so there is no 'failure to disclose.' We have listed all devices in the home, or used by my client, per the interrogatories." [*Id.* (emphasis original).] As is now clear, however, Kelley's responses were **not** "100% accurate" and there **was** a "failure to disclose." Kelley thus compounded her failure to investigate her discovery responses by misrepresenting—through her attorney—the efforts she had undertaken to ensure the accuracy of those responses. These misrepresentations are hardly consistent with a party's duties to investigate and disclose relevant facts, confirming that sanctions against Kelley are appropriate.

### ii.      Attribution of Charles' Misconduct

A party to litigation is generally responsible for the acts or omissions of his agents. As courts have repeatedly noted, for instance, "clients may be held responsible for the acts and

---

[16] As explained more fully below, the actions of an agent—such as a party's attorney—are attributable to the party itself. *See, e.g.*, *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962). It is therefore appropriate to consider attorney Phillips' representations in assessing Defendant Kelley's misconduct. In addition, Kelley herself claimed at the hearing that she was "trying to ensure [her] discovery was 100 percent accurate." [Hr'g Tr. 67:10-12.] Her conduct is thus also inconsistent with her own representations.

omissions of their chosen counsel." *Sun v. Bd. of Trustees of Univ. of Illinois*, 229 F.R.D. 584, 590 (C.D. Ill. 2005), *aff'd sub nom. Sun v. Bd. of Trustees of Univ. of IL*, 473 F.3d 799 (7th Cir. 2007) (quoting *In re Telesphere Communications, Inc.*, 177 F.3d 612, 617 (7th Cir.1999)); *see also Ball v. City of Chicago*, 2 F.3d 752, 756 (7th Cir. 1993) ("[T]he sins of the agent can be visited upon the principal."); *Harrington v. City of Chicago*, 2004 WL 2973750, at *4 (N.D. Ill. 2004) ("[C]lients are held accountable for the acts and omissions of their attorneys."). Similarly, a corporate party is liable for the misconduct of its employees or officers. *See, e.g. Hogue v. Fruehauf Corp.*, 151 F.R.D. 635, 639-40 (C.D. Ill. 1993) ("The Court imposes the sanction of default judgment on the issue of liability . . . to penalize the officers and employees of Fruehauf whose conduct may be deemed to warrant such a sanction against the corporation[.]"); *Fautek v. Montgomery Ward & Co.*, 96 F.R.D. 141, 146 (N.D. Ill. 1982) (finding that sanctions were appropriate when "defendant, through its agents, supplied counsel with misinformation in response to plaintiffs' requests to produce").

This principle, however, is not limited to the attorney-client or employer-employee relationship. In *Margoles v. Johns*, the Seventh Circuit considered a case in which Milton Margoles sued Alida Johns for defamation. 587 F.2d 885, 886 (7th Cir. 1978). The defendant requested numerous documents, and Milton Margoles "turned over to his son the basic task of producing the requested documents." *Id.* at 888. The son failed to meet the deadline for production, and the district court ultimately dismissed the case because of the son's dilatory conduct. *Id.* at 887. On appeal, the Seventh Circuit affirmed: it noted that the son was essentially "the 'alter ego' of his father for purposes of documentary production," and so even if the son was a non-party, "the district court was amply justified in treating the failure of the son as that of the plaintiff." *Id.* at 888.

41

The facts of the current case are analogous. Although Defendant Kelley was the only named defendant at the time of the initial decision to withhold the Western Digital drive and delete files from the Stover drive, Kelley's own testimony indicates that she had "turned over to [her husband] the basic task of producing the requested documents." *Id.* at 888. At the hearing, the following exchange occurred:

> Q: Okay. Now you said when [Plaintiff's counsel] was asking you a series of questions that you didn't actually look for the drives when they were gathered up; is that correct?
> A: Correct.
> Q: Can you tell me why that is?
> A: I trust my husband to gather them.
> Q: So you, if you trust your husband to gather them, is it fair to say that you tasked your husband with gathering them up?
> A: Yes.
> Q: Why would your husband be more qualified to gather them up than you?
> A: I had no idea where they were.

[Hr'g Tr. 91:5-17.] Thus, just as the plaintiff in *Margoles* left it to his agent—his son—to respond to the opposing party's document requests, Defendant Kelley in this case left it to her agent—her husband—to respond to Plaintiff's document requests.[17] And, just as it was appropriate to sanction the party for the agent's misconduct in *Margoles*, it is appropriate to sanction Kelley for her agent's misconduct in this case.[18] Ultimately, then, Kelley cannot escape liability for Charles' misconduct. A party is liable for his agent's discovery misconduct—

---

[17]At the supplemental hearing, Plaintiff's own counsel confirmed that Charles was acting as Kelley's agent at the time of the discovery responses. [*See* Supp. Hr'g Tr. 29:11-20 (emphasis added) ("Perhaps Kelley was foolish or unwise to **rely on her husband**. . . . I am not a married man, but it is my understanding you generally trust your spouse. So when **she tasked [Charles] with doing something**, you know, what she said at the hearing under aggressive questioning, whether or not she investigated, clearly she did. **She had Charles go get hard drives for her** because he actually knew where they were.").]

[18] In dismissing the plaintiff's complaint, the district court in *Margoles* noted that the son had been specifically informed of the deadline for responding to the document requests. *Id.* at 888. Whether Defendant Charles in this case possessed such specific information is unclear, but the court in Margoles considered the son's knowledge only in finding that his discovery misconduct was done willfully—that is, the information was relevant only to the son's mental state. *Id.* Here, the Court has already found that Charles acted in bad faith, and so whether Charles was specifically informed about the nature of the requests is irrelevant to the applicability of *Margoles*.

whether that agent is an attorney, an employee or, as in this case, a family member—and sanctions are therefore warranted against Defendant Kelley.

Defendant Charles' testimony also supports this conclusion. As noted above, Charles refused to answer whether he "agree[d] directly with [his] wife to hide the truth in this case," and whether he "implicitly agree[d] with [his] wife to hide the truth in this case." [Hr'g Tr. 118:2-7.] Charles' refusal to answer these questions supports an inference that he himself engaged in conduct designed to hide the truth in this case. *See Baxter*, 425 U.S. at 318. In some circumstances, however, a witness's refusal allows an additional adverse inference against parties other than the witness. *See, e.g.*, *Kontos v. Kontos*, 968 F. Supp. 400, 406 (S.D. Ind. 1997) ("Several circuit courts have held that in certain circumstances a nonparty witness's invocation of her right not to testify is admissible and an adverse inference against a party may be drawn from the nonparty's witness's refusal to testify.").

To support this extension of the inference, "the party seeking to use the invocation must establish some relationship of loyalty between the other two parties." *Bd. of Trustees of Ironworkers Local No. 498 Pension Fund v. Nationwide Life Ins. Co.*, No. 04 C 821, 2005 WL 711977, at *12 (N.D. Ill. Mar. 28, 2005). This relationship may arise "where there is a close family or business relationship between the person who exercised the Fifth Amendment right and the individual against whom an adverse inference is drawn," or where the interests of the parties in question are closely aligned. *State Farm Mut. Auto. Ins. Co. v. Abrams,* No. 96 C 6365, 2000 WL 574466, at *6 (N.D. Ill. May 11, 2000); *see also Sebastian v. City of Chicago*, No. 05 C 2077, 2008 WL 2875255, at *33 (N.D. Ill. July 24, 2008) ("Most courts that have imputed an adverse Fifth Amendment inference from a nonparty to a party have done so where there is a close family relationship between the party and the nonparty or a business relationship, such as

43

an agency or employer-employee relationship."). More generally, courts assessing whether to impute the adverse inference consider factors such as:

> (1) the nature of the relationships at issue ("The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship."); (2) the degree of control the party has over the non-party witness; (3) the compatibility of the interests of the party and non-party witnesses in the outcome of the litigation; and (4) the role of the invoker in the litigation. The "overarching concern" in assessing the propriety of drawing a negative inference from assertion of the Fifth Amendment privilege by a non-party is "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."

*Abrams*, 2000 WL 574466, at *5-6 (quoting *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997)).

In this case, the Tashiros plainly share a close family relationship by virtue of their marriage, and that bond has remained strong even throughout this litigation. [*See, e.g.*, Hr'g Tr. 28:12-13.] In addition, the Tashiros' interests are aligned: as husband and wife, a judgment or monetary sanction against one spouse would necessarily harm the financial interests of the other spouse. [*See, e.g.*, Hr'g Tr. 65:21-22 (noting that Tashiros have a joint bank account); *see also* Supp. Hr'g Tr. 33:19-20 ("Again, I only point this out because a sanction against Charles, of course, would affect my client").] Finally, the Tashiros' attempt to assert the marital communications privilege, [Hr'g Tr. 24:7-18], indicates that they value their marriage and would prefer to avoid testifying in a way that would harm their relationship.

Based on these considerations, the Court concludes that the Tashiros have the sort of "close family relationship," *Sebastian*, 2008 WL 2875255, at *33, that would support extending a Fifth Amendment adverse inference from one party to another. Thus, when Plaintiff's counsel asked whether Charles had agreed with his wife to hide the truth in this case, the Court may infer that Charles refused to answer not only to protect himself, but also to protect his wife. *See*

44

*Abrams*, 2000 WL 574466, at *7. Defendant Charles' refusal to answer therefore supports an inference that Defendant Kelley agreed with Charles to hide the truth in this case. This confirms the previous conclusion that Kelley was also culpable in the Defendants' discovery misconduct, such that sanctions against Kelley are appropriate.[19]

## B.  Perjury

Plaintiff contends Defendants committed perjury when Defendant Kelley misrepresented the number of hard drives in her home and failed to produce them, [Dkt 130 at 13], and in particular when she did not disclose the Western Digital hard drive. [*See* Dkt. 161 at 2.] Plaintiff also asserts that Defendants perjured themselves when Defendant Kelley lied about the receipt of DMCA copyright infringement notices, [Dkt. 159 at 2], and when Defendant Charles lied about the extent of his BitTorrent use. [*Id.* at 3.] The Court must first apply the relevant definition of perjury and then assess whether Plaintiff's requested sanction of default is appropriate. *See Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) ("The first flaw in the district judge's reasoning is that he failed to apply or even identify *any* legal definition of perjury.").

## 1.  Definition of Perjury

Perjury in the criminal context consists of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (citing 18 U.S.C. § 1621). The offense thus requires three elements: 1) "false testimony;" 2) "materiality;" and 3) "willful intent." *United States v. Savage*, 505 F.3d 754, 763 (7th Cir. 2007). The Seventh Circuit has

---

[19] Again, the Court notes that a Fifth Amendment adverse inference is not sufficient, in and of itself, to impose a penalty on a litigant. *See Lefkowitz*, 431 U.S. at 808 n.5.  As explained above, however, sanctions against Kelley are appropriate not only because of Charles' refusal to testify, but also because Kelley herself failed to investigate whether her discovery responses were accurate. *See supra* part II.A.2.b.i. In addition, Kelley also perjured herself, *see infra* part II.B.2, which would again support an imposition of sanctions independent of Charles' Fifth Amendment invocation. *See, e.g.*, *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) ("Perjury should be severely sanctioned in appropriate cases.").

45

applied this definition when considering litigation sanctions in civil cases, *see, e.g.*, *Montano*, 535 F.3d at 564, and the Magistrate Judge will accordingly apply that definition in this case.

The first element, false testimony, requires a false statement made "under oath or affirmation" and given "at trial or in an affidavit or deposition." *See Zeigler Coal Co. v. Dir., Office of Workers' Comp. Programs*, 326 F.3d 894, 901 n.7 (7th Cir. 2003) (citing Black's Law Dictionary 1485 (7th ed.1999)). Providing "[k]nowingly incomplete and misleading answers to written interrogatories" can satisfy this element. *See Dotson v. Bravo*, 202 F.R.D. 559, 567 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003); *see also Villareal v. El Chile, Inc.*, 266 F.R.D. 207, 211 (N.D. Ill. 2010) (answers to interrogatories are "nothing short of testimony").

The second element, materiality, requires that the false statement have a "natural tendency to influence" or be "capable of influencing" the decision-maker to whom it is addressed. *Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 957 (N.D. Ill. 2013). The statement must be material at the time it is made, and need not actually affect any resulting decision. *Id.*

The third element, intent, may be inferred from the circumstances, but "inconsistencies alone do not in every instance support an inference of intent to testify falsely." *Montano*, 535 F.3d at 564. A lack of any "plausible explanation for the differences between" a party's statements may support an inference of intent to lie, *see Alexander*, 930 F. Supp. 2d at 961, but in some circumstances, "other evidence" may be necessary for the Court to determine that parties "deliberately fabricated their testimony." *Montano*, 535 F.3d at 564. The Court now considers whether any of Plaintiff's alleged instances of perjury satisfy the above-described elements.

### 2. Alleged Misrepresentations About Hard Drives

Plaintiff's interrogatories instructed Defendant Kelley as follows:

46

> Identify by brand, trademark, model number, version and by any other relevant form of identifier each of the Computer Devices used in your home during the preceding two years and for each such Computer Device, state when it was purchased, from where it was purchased, who is authorized to use the Computer Device, who has been authorized to use the Computer Device, the times during which each such person was authorized to use the Computer Device, and identify the person who primarily uses the Computer Device.

[Dkt. 130-2 at 3. (Interrogatory No. 4).] Defendant Kelley answered on October 17, 2013 and supplemented her answers on December 31, 2013; on January 16, 2014; and on January 19, 2014. [*Id*. at 11.] Her responses indicated that only four computer devices had been used in the Tashiro household in the previous two years. [*See id.* at 3.]

On May 31, 2014, Kelley served a fourth supplement to her interrogatory answers. [*Id.* at 11.] At this time, she disclosed the existence of the Western Digital hard drive, and she stated that she "only recently became aware of [it]" because Charles—rather than Kelley—was the drive's primary user. [*Id.* at 4.] Plaintiff's motion claims that Kelley was aware of the Western Digital drive prior to this last supplement, such that her earlier answers to Plaintiff's interrogatories were materially false. [Dkt. 161 at 2.]

Plaintiff relies largely on Kelley's answers to Plaintiff's later requests for admission. [*See id.*] In her responses to these requests, Kelley admitted that she was aware of the Western Digital hard drive prior to the May 31, 2014 supplement, [*id.* at 2-3], and Plaintiff thus concludes that Kelley must have made the deliberate decision to omit the drive from her earlier interrogatory answers. [*See id.*]

At the hearing, however, Kelley testified that the she "first became aware of [the Western Digital] hard drive [on] May 22, 2014," [Hr'g Tr. 90:8-11], and that prior to that time, Defendant Charles had withheld the drive's existence from her. [Hr'g Tr. 90:12-22.] This testimony indicates that Kelley's interrogatory answers are not inconsistent with her later response to the

47

request for admissions: the initial interrogatory answers and the first three supplements all pre-dated May 22, 2014, and so at the time of these responses, Kelley did not know about the Western Digital hard drive. Thus Kelley did not intentionally omit the drive's existence in these responses.

At the same time, however, the date on which Kelley learned of the drive—May 22, 2014—obviously pre-dated the May 31, 2014 date indicated in Plaintiff's requests for admissions. Thus, even if Kelley had **no** knowledge of the drive at the time of her **earlier** interrogatory responses, she was still required to admit that she **did** have knowledge of the drive before May 31, 2014. This explanation resolves any apparent inconsistency in Kelley's discovery responses, and it indicates that she did not intentionally omit the drive's existence in her earlier responses. Her interrogatory answers regarding the Western Digital drive therefore do not constitute perjury.

Apart from the Western Digital hard drive, however, it emerged at the hearing that Defendants had withheld the existence of another computer: a Dell XPS 600. Defendants did not divulge the existence of this computer in their initial answers to Plaintiff's interrogatories, nor in their supplements to those interrogatories, [*see* Dkt. 130-2 at 3-4], and in fact, Plaintiff apparently became aware of the XPS 600 only shortly before the hearing. [Hr'g Tr. 124:11-17; *see also* Supp. Hr'g Tr. 48:17-22.] Nonetheless, Defendant Kelley testified that the computer was in the Defendants' household until the spring or summer of 2012. [Hr'g Tr. at 44:15-23.] She added that Defendant Charles "predominantly used" this computer, [Hr'g Tr. at 44:24-25], but that she herself sometimes accessed the computer's files as well. [*See* Hr'g Tr. 95:7-97:3.]

Kelley's own testimony thus indicates that the Dell XPS 600 was "used in [her] home during," [Dkt. 130-2 at 3 (Interrogatory No. 4)], during the two years before the interrogatories

were propounded. The Dell XPS 600 therefore should have been disclosed in Kelley's answers to Plaintiff's interrogatories.[20] This, in turn, establishes that Kelley's answers were in fact "false," such that her answers may support a finding that she committed perjury. *See Dotson*, 202 F.R.D. at 567 ("incomplete and misleading" interrogatory answers may constitute perjury).

Kelley's failure to disclose the Dell XPS 600 was also "material." As noted above, a false statement or omission is "material" if it has a "natural tendency to influence" or to be "capable of influencing" the decision-maker to whom it is addressed. *Alexander*, 930 F. Supp. 2d at 957. Here, Kelley testified that the Dell XPS 600 was "hit by lightning or fried" sometime in spring or summer of 2012. [Hr'g Tr. 45:1-4.] She then testified that her husband's practice was to convert such damaged computers into storage devices. [Hr'g Tr. 45:6-9.] She maintained that Charles did not do so with the XPS 600, [Hr'g Tr. 45:10-11], but she conceded that the computer could have been used during the period of recorded infringement, [Hr'g Tr. 45:18-23], and she conceded that she did not know whether the computer's hard drive had BitTorrent files on it. [Hr'g Tr. 46:11-17.]

Knowing such information naturally would have affected Plaintiff's strategy in this case. Had Plaintiff known about the XPS 600, Plaintiff could have deposed Defendants about the contents of the XPS 600; could have requested that the computer's hard drive be made available

---

[20] Defendant Kelley contends that her incomplete response was justified because she objected to Interrogatory No. 4 on the grounds that it was vague. [Dkt. 137 at 12-13.] Regardless of that objection, however, Kelley disclosed the existence of four other computer devices in her initial responses and eventually disclosed the existence of the Western Digital drive in her fourth supplement. [Dkt 130-2 at 3-4.] She thus apparently did not rely on the objection to avoid disclosing other computer devices, such that the Dell XPS 600 should also have been disclosed. In addition, Kelley's objection was that the interrogatory was "vague" because the term "use" was not defined. [Dkt. 130-2 at 3.] This term, according to Kelley, could be read broadly to encompass *any* kind of use—such as passive storage of material on a hard drive—or could be read narrowly to encompass only more active use—such as "interact[ing]" with a device by saving or deleting files. [*Id.*] Here, Kelley was obviously "interacting" with the XPS 600 by accessing files on it, [*see* Hr'g Tr. 95:7-97:3], such that the XPS 600 should have been disclosed even if Kelley had adopted her own more restrictive reading of the term "use." The objection was thus no basis for concealing the existence of the XPS 600.

for forensic imaging; or otherwise could have investigated whether the XPS 600 was used to infringe Plaintiff's copyrighted movies. Moreover, when Plaintiff's attorney asked Defendant Charles about the XPS 600, the following exchange occurred:

> Q: The Dell XPS 600 had many BitTorrent movies on it, didn't it?
> A: I wish to assert my Fifth Amendment privilege.
> Q: The Dell XPS 600 had Plaintiff's adult movies on it, didn't it?
> A: I wish to assert my Fifth Amendment privilege.

[Hr'g Tr. 122:6-11.] From these responses, the Court may infer that the Dell XPS did in fact contain evidence that Defendants illegally downloaded Plaintiff's copyrighted works. *See Baxter*, 425 U.S. at 318. Because of Kelley's false interrogatory answers, however, Plaintiff had to forego any investigation of the XPS 600. As a result, the concealment of the Dell XPS 600 clearly had a material effect on the course of this litigation.

Because the omission of the XPS 600 was "false" and "material," the only remaining issue is whether Kelley's omission was "intentional." *See Savage*, 505 F.3d at 763 (listing elements of perjury). At the hearing, Kelley testified that although Charles was the primary user of the XPS 600, Kelley herself would often use a file-sharing program to obtain files from that computer. [Hr'g Tr. at 95:7-97-3.] She was also able to recall that the computer was in use until spring or summer of 2012, well within the period covered by Plaintiff's interrogatories. [Hr'g Tr. 44:15-23.] Based on this testimony, it is unlikely that Kelley would simply have forgotten about the XPS 600 when answering Plaintiff's interrogatories in 2013, and the Court may thus infer that Kelley made the intentional decision to omit the XPS 600 from her responses. *See Montano*, 535 F.2d at 564-65 (noting that intent to lie may be inferred from the circumstances).

Conceivably, of course, Kelley's decision to omit the XPS 600 could have been the result of confusion or mistake. Kelley testified that the XPS had been struck by lightning and damaged in the spring or summer of 2012. [Hr'g Tr. 45:2-3.] She might thus have concluded, albeit

erroneously, that the computer would not be of interest to Plaintiff or that any data that had once been stored on the computer would not be recoverable. In such a case, her mistake would absolve her of liability for perjury. *See Montano*, 535 F.3d at 564 (perjury results from "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory").

This alternative explanation, however, is hardly credible. Rather tellingly, Kelley testified that, despite the lightning strike, no electronic device in the Tashiros' home other than the XPS 600 was damaged, [Hr'g Tr. 45:3-5; 100:12-15], and she added that she had never even discussed the lightning strike with her husband. [Hr'g Tr. 100:16-22.] Then, during Defendant Charles' examination, Plaintiff's counsel asked, "[The Dell XPS 600] was not stricken [sic] by lightning, was it?" [Hr'g Tr. 126:25.] Charles responded by asserting his Fifth Amendment privilege. [Hr'g Tr. 127:1.] This, in turn, implies that the alleged lightning strike did not occur, such that Kelley's testimony about this event was itself fabricated. It is thus probable that Kelley did in fact give false testimony, both in deciding to omit the XPS 600 from her interrogatory responses and in reciting the story of the lightning strike to account for that omission. As a result, Kelley's representations regarding the XPS 600 constitute perjury.

Alternatively, even if Kelley did not perjure herself, the events surrounding the XPS 600 merely compound her earlier-described failure to reasonably investigate her responses to Plaintiff's interrogatories. As described above, the XPS 600 was a computer device used within the Tashiros' household during the period of recorded infringement. It thus fell within the scope of Plaintiff's interrogatories, [*see* Dkt. 130-2 at 3], and it should have been disclosed. Kelley's failure to even mention the computer, let alone produce it for imaging, smacks of willful

disregard for her duty to investigate her discovery responses, and her conduct is once again sanctionable.[21]

    In sum, then, Kelley cannot escape sanctions for her conduct with regard to the Dell XPS 600. At best, her omission of the XPS 600 from her discovery responses resulted from an egregious failure to reasonably investigate whether her interrogatory answers were complete. At worst, her failure to include the XPS 600 was a knowing and intentional omission that indicates that she did in fact commit perjury. *See, e.g.*, *Dotson*, 202 F.R.D. at 567 ("Knowingly incomplete and misleading answers to written interrogatories constitute[] perjury[.]"). In either case, these findings support an imposition of sanctions against Kelley.

### 3. Alleged Lies about DMCA Notices

    Plaintiff alleges that Defendant Kelley perjured herself when she responded to Plaintiff's Interrogatory No. 11 and Plaintiff's Request for Production No. 7. [Dkt. 159 at 2.] These requests asked whether Kelley had received DMCA copyright infringement notices from Comcast, but Kelley responded that she had not received such notices. [Dkt. 130-2 ¶ 11; Dkt. 159 at 2.] Plaintiff explained that it had deposed a representative from Comcast, and that this representative testified that Comcast had actually sent seven copyright infringement notices to one of Defendants' email accounts. [Hr'g Tr. 68:10-13; *see also* Pl.'s Ex. 50 at 29:5-13 (Dep. of Colin Padgett).] Plaintiff thus maintains that Kelley's discovery responses were false. [*See* Dkt. 159.]

    At the hearing, however, Kelley testified that when she subscribed to Comcast, she provided her husband's email address. [Hr'g Tr. 69:8-13.] She later added that although she was occasionally able to see her husband's emails "[i]f he leaves up his computer with his email

---

[21] Defendants' counsel make much of the fact that Plaintiff has not been able to locate any of its movies on any of Defendants' computer devices. Defendants' failure to disclose the XPS 600, coupled with Defendant Charles' deletion of computer files, goes far in explaining Plaintiff's difficulty in locating evidence of its movies.

open," she generally she did not have access to his account. [Hr'g Tr. 104:5-14.] She further testified that she was not aware that Comcast had sent the notices to her husband's account. [Hr'g Tr. 69:17-23.]

Based on this testimony, the Court finds that Kelley did not intentionally make false statements in her responses to Plaintiff's requests for information about the notices. If the notices were sent to an email account that Kelley did not and could not regularly access, then it is plausible that she did not know about the emails. Thus, even if her discovery responses regarding the emails ultimately were not accurate, Kelley did not **intentionally** falsify the responses, such that these responses do not constitute perjury.

This finding, of course, does not absolve Kelley of blame. As noted above, a party must take "reasonable steps" to ensure his or her discovery responses are "complete and accurate." *Fautek*, 96 F.R.D. at 145. Here, Kelley provided Comcast with her husband's email address when she set up the Comcast account, [Hr'g Tr. 69:3-13], and it thus would have been a "reasonable"—indeed, obvious—step in responding to Plaintiff's requests to ask her husband if any communications had been sent to that account. Further, the interrogatories served on Kelley stated as follows: "Identify any communication you have received" from Comcast in the preceding two years. [Dkt. 130-2 at 7.] The interrogatories defined "you" as both Kelley and "any other person(s) or entity(ies) acting or purporting to act on [Kelley's] behalf or under [Kelley's] control." [Dkt. 161-1 at 3.] As described above, Kelley enlisted Charles' aid in answering Plaintiff's discovery requests, and so complying with the directions in the interrogatories would have required her to ask whether Charles had received any copyright

infringement notices from Comcast. That she evidently did not do so confirms once again that

her efforts to comply with her discovery obligations were sanctionably deficient.[22]

### 4.  Alleged Lies about Extent of BitTorrent Use

Plaintiff alleges that Defendant Charles lied about the extent of his BitTorrent use when

he testified at his deposition that he used the protocol "just for music" and had never used it to

download other media, such as movies. [*See* Charles Dep. 27:6-13.] At the hearing, the following

exchange occurred:

> Q: Mr. Tashiro, did you intentionally fail to tell the truth during your deposition in
> this case?
> . . .
> THE WITNESS: I wish to invoke my Fifth Amendment privilege.
> . . .
> Q In your deposition, you testified that you had not used BitTorrent except on Ed
> Stover's drives, correct?
> A: I assert my Fifth Amendment privilege.
> Q: And in your deposition, you said you only used it for certain purposes,
> BitTorrent; isn't that correct?
> A: I wish to assert my Fifth Amendment privilege.
> Q: Did you ever use BitTorrent to download movies?
> A: I wish to assert my Fifth Amendment privilege.
> Q: Did you ever use BitTorrent to download adult movies?
> A: I wish to assert my Fifth Amendment privilege.
> Q: Did you ever use BitTorrent to download music?
> A: I wish to assert my Fifth Amendment privilege.
> Q: Did you ever use BitTorrent to download Plaintiff's adult movies?
> A: I wish to assert my Fifth Amendment privilege.
> . . .
> Q: Have you ever watched movies that you downloaded via BitTorrent with your
> wife?
> A: I wish to assert my Fifth Amendment privilege.

---

[22] Kelley's own attorney acknowledged as much when he noted that "maybe . . . she didn't do a good enough job" in responding to Plaintiff's discovery requests. [Hr'g Tr. 73:17.] He also asserted that such failures were not included in Plaintiff's motion for sanctions, [Hr'g 73:17-18], but this is simply not true, as Plaintiff's supplement to its motion for sanctions specifically faults Kelley for her inadequate responses regarding communications from Comcast. [Dkt. 159 at 2-3.] In any event, a court deciding the propriety of sanctions "considers the defendants' discovery conduct as a whole, and [does] not focus solely on the straw that broke the camel's back." *Domanus v. Lewicki*, 742 F.3d 290, 302 (7th Cir. 2014) (citation and quotation marks omitted). The Court may thus appropriately consider Kelley's discovery failures without regard to whether Plaintiff specifically raised each individual failure.

Q: Have you ever watched adult movies which you downloaded via BitTorrent with your wife?
A: I wish to invoke my Fifth Amendment privilege.
Q: Have you ever listened to music which you downloaded via BitTorrent with your wife?
A: I wish to assert my Fifth Amendment privilege.
. . .
Q: Did you ever watch Plaintiff's adult movies that you downloaded via BitTorrent with your wife?
A: I wish to assert my Fifth Amendment privilege.

[Hr'g Tr. 115:8-121:1.] Based on this exchange, the Court may infer that Charles did in fact "intentionally fail to tell the truth during [his] deposition." [Hr'g Tr. 115:8.] This satisfies the intent and falsity elements of perjury, leaving only materiality, but Charles' lies were also plainly material: Because Charles refused to state whether he had "download[ed] Plaintiff's adult movies" via BitTorrent, [Hr'g Tr. 118:20-22; 120:24-121:1], the Court may infer that Plaintiff did so. This conduct goes directly to the heart of Plaintiff's underlying copyright infringement claim, and Charles's lies about this conduct would naturally influence a fact-finder's decision regarding Charles' liability in this case. As a result, Charles gave intentionally false deposition testimony about a material matter, and he therefore committed perjury.

Other evidence corroborates this finding: First, Mr. Paige executed a declaration indicating that he examined the Western Digital hard drive and found "extensive evidence of BitTorrent use as well as numerous pirated software, movies, and music" files. [Dkt. 139-1 ¶ 10.] Because Charles Tashiro was the "primary user" of this hard drive, [*see* Dkt. 130-2 at 4 (Def.'s Resps. to Pl.'s Interrogs.)], this finding implies that Defendant Charles did in fact use BitTorrent to download material other than music, such that his testimony to the contrary was false. Further, because the evidence of BitTorrent use was "extensive," it is unlikely that Charles merely forgot or was confused about his use of BitTorrent, such that his lies were intentional.

Next, Mr. Patzer indicated that IPP recorded someone with the Tashiros' IP address downloading adult movies via BitTorrent. [*See* Hr'g Tr. 201:23-202:3.] Defendant Kelley testified that she never used BitTorrent, [Hr'g 60:7-9], and other testimony indicated that the Tashiros' internet account was password protected during the period of recorded infringement. [Hr'g Tr. 36:5-20.] Plaintiff then established that it had deposed each of the Tashiros' neighbors, and that all of them denied being able to access the Tashiros' internet account. [Hr'g Tr. 38:18-39:3.] Together, this testimony indicates that Defendant Charles was the only person who could have used the Tashiros' internet account to download adult movies, thereby confirming that his deposition testimony to the contrary was false. The Court thus concludes—again—that Charles perjured himself at his deposition.

### C.  Attorney Phillips' Conduct

Based on the foregoing, Defendants Kelley and Charles spoiled evidence, committed perjury, and failed to investigate whether their discovery responses were complete and accurate. Plaintiff, however, alleges that the above-described misconduct extends to Defendants' counsel. [*See* Dkt. 130 at 1.] Plaintiff contends that attorney Phillips failed to fulfill his obligations to the Court and to his opposing counsel, and Plaintiff asserts that Phillips has been "untruthful and acted fraudulently throughout the course of this litigation." [*Id.* at 2.]

Plaintiff is correct that "lawyers have a duty to act in good faith in complying with their discovery obligations and to cooperate with and facilitate forthright discovery." *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 342 (N.D. Ill. 2005) (citing *Johnson v. J.B. Hunt Transport, Inc.*, 280 F.3d 1125, 1132 (7th Cir. 2002)). They must "respond to interrogatories reasonably," they must base their discovery responses "on a good faith belief in their merit," and they "must be mindful of [their] obligations to the administration of justice, which is a truth-

seeking process designed to resolve human and societal problems in a rational, peaceful, and efficient manner." *Thompson v. Fajerstein*, No. 08 CV 3240, 2010 WL 4628515, at *5 (N.D. Ill. Nov. 8, 2010) (citations and alterations omitted). If a lawyer fails to full these obligations, the Court may use its inherent powers to sanction the culpable attorney. *See, e.g.*, *United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003) (citations and quotation marks omitted) ("Key among the inherent powers incidental to all courts is the authority to control admission to its bar and to discipline attorneys who appear before it, and, as we have noted previously, a federal court has the inherent power to sanction for conduct which abuses the judicial process.").

Phillips' conduct in this case borders on sanctionable. First, Phillips clearly did not persuade his clients to accurately respond to Plaintiff's discovery requests: he claimed that he was waiting to "hear back to ensure the responses were 100% accurate," [Dkt. 130-3 at 1 (emphasis original)], but the above-noted omissions of the Western Digital hard drive and the Dell XPS 600 indicate that his efforts to ensure such accuracy were ultimately inadequate.

In addition, Phillips' correspondence with Plaintiff's counsel was especially alarming. Plaintiff informed Phillips about the undisclosed Western Digital drive on April 8, 2007 at 6:01 p.m. [Dkt. 130-3 at 4.] Less than four hours later, Phillips responded that his clients were unaware of the drive. [*Id.*] Plaintiff's counsel then replied at 10:13 p.m. on April 8. [*Id.* at 7.] He explained that the undisclosed drive had been connected to one of the previously disclosed drives in the early morning hours of December 23, 2013. [Dkt. 130-3 at 7.] He based this assertion on timestamps indicating that the drive had been connected at approximately 3:15 a.m. UTC [*Id.* at 3.] Phillips responded the next day at 12:21 p.m. He claimed that his client "connected nothing," and suggested that the connections were "done by Q-discovery," since the connections "were made the day they were in the possession of Q-discovery." [Dkt. 130-3 at 7.]

This suggested explanation was impossible. The timestamp on which Plaintiff relied was listed in Coordinated Universal Time (UTC). [Dkt. 130-3 at 3.] Thus, the 3:15 a.m. timestamp corresponded to 10:15 p.m. EST on December 22, 2013. The drives at this time were **not** in possession of Quantum Discovery. [*See* Dkt. 76-1 ¶ 25.] Instead, they were in Defendants' possession. [*See id.*] The connection of the undisclosed drive thus could **not** have been explained by the actions of Quantum Discovery, and if Phillips had taken any time to consider his response to Plaintiff's email, he surely (the Court hopes) would have realized the absurdity of his statements.

Alas, that is not the end of Phillips' correspondence: having just offered his own impossible explanation for the connections, Phillips—in the same April 9 email—asserted that Plaintiff's own allegations were "impossibl[e]" and "patently absurd." [Dkt. 130-3 at 7.] He then advised Plaintiff's counsel to reconsider his claims because he, Phillips, would be "holding you to your Rule 11 obligations." [Dkt. 130-3 at 7.]

Plaintiff's counsel responded via email and explained that Phillips' suggestion was, as described above, impossible, [Dkt. 130-3 at 10], but Phillips remained undaunted. He responded approximately one hour later, and he continued to assert that any drives that were connected on the night of December 22, 2013 must have been connected by Quantum Discovery or must have been drives that had already been disclosed. [*Id.*] Again, Phillips invoked Rule 11: "Its [sic] not my job to provide you advice to prevent a Rule 11 violation, but as a professional courtesy, I'm telling you that all ducks should be in a row, and all investigations had, because you're going down a wrong path here on bad information." [*Id.*]

Phillips statements in the above-described correspondence are unseemly and inappropriate. Plaintiff's counsel confronted Phillips with documented evidence of the existence

of a specific hard drive that had not been disclosed, yet Phillips' responses showed no intent whatsoever to investigate those claims. His invocation of Rule 11 was especially improper, as he apparently sought to interpose the rule as an obstacle to forestall any investigation into his client's misconduct. That alone borders on sanctionable conduct, *see, e.g.*, *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 485 (3d Cir. 1987) ("A court may impose sanctions on its own initiative when [Rule 11] is invoked for an improper purpose."), and were Phillips' emails the only evidence of his conduct in this case, the Court would not hesitate to impose sanctions.

At the supplemental hearing, however, the Court afforded Phillips an opportunity to explain his actions. There, he explained that, despite the timing of his emails, he did in fact contact his clients to try to unearth the truth about the Western Digital hard drive before responding to Plaintiff's inquiries. [Supp. Hr'g Tr. 38:15-39-40:3.] He also offered to submit to the Court emails that he had sent to his clients as part of his investigation of Defendants' alleged misconduct. [Supp. Hr'g Tr. 47:22-48:10.] Based on these representations, the Court finds that Phillips did not indiscriminately rely on his clients' representations about their disclosures, such that he did—albeit barely—fulfill his obligations to see that his clients' discovery responses were accurate. Further, the Court acknowledges that its inherent powers must be used "with restraint and discretion." *Johnson*, 327 F.3d at 560 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Here, it seems that—if his representations about his investigations are true—then Phillips was a victim of his clients' deceit, just as were Plaintiff's counsel and this Court. In these circumstances, the Court will exercise its discretion to refrain from sanctioning Phillips.

### D.  Magnitude of Appropriate Sanction

Having concluded that Defendants spoiled evidence, committed perjury, and failed to fulfill their discovery obligations, the Court now addresses the appropriate sanction. A district

court has broad discretion in its choice of sanction, but any sanction imposed pursuant to the Court's inherent powers "should be proportionate to the gravity of the offense." *Montano*, 535 F.3d at 563. The goals of such sanctions are to "remedy prejudice to [the opposing] party," "reprimand the offender," and "deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (quotation omitted).

Plaintiff in this case requests entry of a default judgment against Defendants. [Dkt. 130 at 4.] Default is an "extreme" and "draconian" sanction that courts should impose infrequently. *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993). A court should thus generally consider whether the alleged misconduct has seriously prejudiced the opposing party, but, as noted previously, a finding of prejudice is not a prerequisite for dismissal or default. *Id.* Instead, the misconduct at issue may be so egregious that allowing the case to continue "would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Id.*

Similar considerations inform imposition of sanctions for perjury.  "As a fraud on the court, perjury may warrant the sanction of dismissal," but dismissal or default is not appropriate in all situations. *Montano*, 535 F.3d at 564. The "severity of a sanction should be proportioned to the gravity of the offense," such that perjury may not warrant default when, for instance, the "opposing litigant [has] perjured himself as well," when the perjury is "quickly discovered," or when the perjury is "harmless so far as affecting the course of the litigation." *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003). Thus, in choosing between default and a lesser sanction, a court should consider "(1) prejudice to the [opposing party]; (2) prejudice to the judicial system; and (3) deterrence and punishment." *Dotson*, 202 F.R.D. at 575. Before

imposing default, a court must support its decision by clear and convincing evidence,[23] and should consider whether lesser sanctions would adequately advance the goals outlined above. *See REP MCR Realty*, 363 F. Supp. 2d at 1010.[24]

In this case, the prejudice to the opposing party is clear. First, Plaintiff's expert indicated that Malibu Media's copyrighted content could have been among the files that were deleted from the Stover drive, [Dkt 76-1 ¶ 28], such that the deletion would naturally impair Plaintiff's ability to prove its underlying claim of illegal copying. Second, Charles' refusal to answer certain questions about the Dell XPS 600 indicate that this computer had incriminating information on it, [*see* Hr'g Tr. 115:16-21], such that the Defendants' refusal to produce the computer naturally impaired Plaintiff's ability to prove its copyright claim. The loss of such obviously material evidence supports imposition of a correspondingly harsh sanction, such that default judgment is appropriate. *See, e.g.*, *Krumwiede*, 2006 WL 1308629, at *10-11 (entering default in response to "spoliation of evidence . . . essential to [opposing party's] claim").[25]

Next, Plaintiff suffered extensive prejudice in bringing the instant motion and pursuing evidence that Defendants should have long ago disclosed. [*See, e.g.*, Dkt. 130 at 2 ("Plaintiff

---

[23] Recent cases have questioned whether clear and convincing evidence is necessary, but these cases have not yet overruled the existing precedent that requires this elevated standard of proof. *Asia Pac. Telecom*, 788 F. Supp. 2d at 790 (citing *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC*, 516 F.3d 623, 625–26 (7th Cir. 2008); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007)).

[24] Certain cases also indicate that default is appropriate only upon a showing of "willfulness, bad faith, or fault." *See, e.g.*, *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003); *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 982 (N.D. Ill. 2011). Here, however, the Court has already found that Defendant Charles acted in bad faith and that this conduct was attributable to Defendant Kelley. In addition, "fault," refers to "the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation." *JFB Hart*, 764 F. Supp. 2d at 982 (citation and quotation marks omitted). As described above, Defendant Kelley in this case did not make a "reasonable" investigation into the accuracy of her discovery responses. She therefore acted with "fault," such that default is appropriate even if Charles' bad-faith conduct were not attributable to her.

[25] Defendants claim that any prejudice to Plaintiff was actually minimal because all deleted files on the Stover drive were recoverable. [Dkt. 137 at 10.] The Court, however, has previously rejected this assertion, *see supra* part II.A.2.a, and has found it more likely that many files were overwritten and unrecoverable. Further, the recovery of some files does not redress the prejudice that Plaintiff has suffered in bringing the instant motion or in addressing Defendants' failure to disclose evidence.

spent a significant amount of time working on a strategy to further prove . . . that the drives in fact existed and that Defendants were being untruthful.").] Indeed, Kelley Tashiro acknowledged that searching for the Western Digital drive "[w]asted a lot of [Plaintiff's] time, money, and energy," [Hr'g Tr. 81:22-24], underscoring just how harmful Defendants' misconduct has been.

Even worse, however, was the harm to the judicial system as a whole. As the Supreme Court has observed, "[f]alse testimony in a formal proceeding is intolerable," and a court "must neither reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary proceedings." *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) (citation omitted). Here, however, Defendant Charles perjured himself at his deposition, and Defendant Kelley either perjured herself in her responses to Plaintiff's interrogatories or, at best, failed to conduct a reasonable inquiry into the completeness of her discovery responses. In either case, Defendants' conduct threatened to undermine the "truth-seeking function" of this litigation, and the Court will not tolerate this "affront" to the judicial process.

Moreover, the Supreme Court has noted that falsehoods and obfuscation "may put the factfinder and parties 'to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means.'" *ABF Freight*, 510 U.S. at 323 (quoting *United States v. Norris*, 300 U.S. 564, 574 (1937)). This observation could hardly be more relevant to this case: exposing the Tashiros' misconduct required multiple motions for sanctions, [Dkts. 130 & 159], a flurry of motions in limine, [Dkts. 170, 172, 173, 175, 176, 177 & 179], an aborted evidentiary hearing, [Dkt. 206], a later, day-long evidentiary hearing, [Dkt. 234], and a supplemental hearing for additional argument, [Dkt. 241], all of which could have been avoided had the Tashiros' simply been more forthcoming in their responses to

62

Plaintiff's discovery requests. The Tashiros have thus imposed a severe burden on the judicial system, and the sanction for their conduct must likewise be severe.

Further, a sanction short of default would not appropriately address the goals of deterrence and punishment. An adverse inference, for instance, would help redress the prejudice that Plaintiff has suffered by, for example, requiring the jury to infer that Plaintiff's copyrighted works would have been found on the hard drive from which files were deleted. But such a sanction would allow the case to continue to trial and would thus allow Defendants to press their case to this Court. In light of their misconduct, Defendants should not be allowed to do so: "litigants who use the judicial process have certain obligations and responsibilities," among them upholding "the integrity of the judicial process in general." *Dotson*, 202 F.R.D. at 574. Where, as here, a party instead makes a mockery of the judicial process, that party forfeits continued access to that process. *See id.*; *see also REP MCR Realty*, 363 F. Supp. 2d at 1012 (N.D. Ill. 2005) ("Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.").

Similarly, a monetary sanction would help redress the prejudice Plaintiff has suffered and would help punish the offenders, but it would not adequately protect the judiciary. Such a sanction would allow Defendants to continue to assert the protections of the judicial system against Plaintiff's claim despite Defendants' continued abuse of that very system. Moreover, such a sanction would send a message that the Court is willing to accept perjury so long as parties are willing to write a check. This the Court will not do: "Toleration of perjury is unseemly;" "[f]alse testimony in a formal proceeding is intolerable;" and "truthful discovery" is too important to the "entire civil justice system" to allow Defendants to continue to debase the

63

"truth-finding processes" of this Court with their continued presence before this tribunal. *Dotson*, 202 F.R.D. at 570, 573.

Finally, the Court notes that, even if default is a "draconian" sanction, *Barnhill*, 11 F.3d at 1367, courts have frequently determined that default is appropriate in cases in which parties have exhibited extensive patterns or repeated incidents of misconduct. *See, e.g.*, *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) (upholding dismissal where plaintiff compounded initial fraud by attempting "to hide such behavior behind a cloak of further fraud and deceit"); *Alexander*, 930 F. Supp. 2d at 961 (dismissing case after revelation of "pervasive" perjury); *REP MCR Realty*, 363 F. Supp. 2d at 1010-11 (N.D. Ill. 2005) (dismissal appropriate where party "destroyed significant documents and committed perjury"); *Dotson*, 202 F.R.D. at 575 (dismissing case when party provided "misleading answers on a continual basis" and "also committed perjury"); *Brady v. United States*, 877 F. Supp. 444, 452-53 (C.D. Ill. 1994) (dismissing case where party offered incomplete interrogatory answers and repeatedly perjured himself).

Here, the Court finds by clear and convincing evidence that Defendants have engaged in a similar pattern of misconduct. Defendants spoiled evidence, committed perjury, and failed to discharge their duties to conduct discovery reasonably and in good faith. They lied to the opposing party; they withheld the existence of material evidence; and they deleted potentially damaging computer files the very night before they were to relinquish such files for discovery. Just as in the cases cited above, this extensive pattern of conduct warrants the harshest of sanctions, and the Magistrate Judge accordingly recommends that the Court enter default judgment against both Defendants.

## III.    Conclusion

For the reasons set forth above, the Magistrate Judge recommends that the Court

**GRANT** Plaintiff's Motion for Sanctions Against Defendants for Spoliation of Evidence and

Perjury, [Dkt. 130], and enter default judgment against Defendants Charles and Kelley Tashiro.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the

Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely

file objections within fourteen days after service shall constitute a waiver of subsequent review

absent a showing of good cause for such failure.


Date:  05/18/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Jonathan LA Phillips
jphillips@skplawyers.com

Jason H. Cooper
LIPSCOMB, EISENBERG & BAKER, PL
jcooper@lebfirm.com

Michael K. Lipscomb
LIPSCOMB, EISENBERG & BAKER, PL
klipscomb@lebfirm.com

Paul J. Nicoletti
NICOLETTI LAW, PLC
paul@nicoletti-associates.com

Jonathan LA Phillips
SHAY KEPPLE PHILLIPS, LTD
jphillips@skplawyers.com

Erin Kathryn Russell
THE RUSSELL FIRM
erin@russellfirmchicago.com